UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF FLORIDA

GAINESVILLE DIVISION

In re:

LYNETTE MICHELLE LACEY ALEXIS PRESTON,

FILED USBC NDFL TLMAIL
OCT 23 2026 PM2:49

Debtor.

Case No. 25-10173-MWC | Chapter 7

**DECLARATION OF JOHN COOK, NON-DEBTOR CO-OWNER AND LISTED CREDITOR, IN SUPPORT OF EMERGENCY MOTION TO PROTECT HIS PROPERTY INTEREST AND ENFORCE PROTECTIVE ORDER**

I, John Cook, declare as follows:

**A. My identity, ownership, and limited purpose**

**1.** I am an adult resident of Levy County, Florida. I am not a debtor in this bankruptcy case. I am listed as a creditor. I make this declaration to protect my own ownership and privacy interests and to support enforcement of the Court's existing protective order.

**2.** The events I describe as my observations are within my personal knowledge. When I describe what someone told me or what a court record states, I identify that source. I could testify to my own observations if called as a witness.

**3.** I co-own the real property located at 151 N. Otter Creek Avenue, Otter Creek, Florida 32683 (the "Property"), with the Debtor, Lynette Preston. We are not married and were not married when the Property was acquired. The deed on which I rely is recorded in Levy County Official Records Book 1610, Page 877, Instrument No. 691930. Exhibit 1 identifies that deed.

**4.** I claim an undivided one-half ownership interest in the Property in my own right. My interest is separate from Ms. Preston's interest. I have not consented to a sale, transfer, or encumbrance of my ownership interest, and I have not agreed to surrender it in a settlement.

**5.** I understand that the Trustee and the Trustee's counsel are pursuing a possible sale of the Property. There have been settlement discussions, but I have not agreed to a settlement disposing of my interest. I want the Court to determine my rights before any transaction purporting to dispose of that interest is completed.

**6.** I request notice, an opportunity to be heard, and the procedures and findings required before my interest can be sold over my objection. My cooperation with an inspection was not consent to a sale or settlement.

**B. The Protective Order and the October 11 publication**

**7.** The Court entered a protective order on October 2, 2026, identified as Doc. 169 (the "Protective Order"). Exhibit 2 is the complete order on which I rely. My understanding is that the inspection was to occur subject to that order, rather than as an unrestricted opportunity to obtain public content.

**8.** Paragraph 2 of the Protective Order provides that a third-party inspector "designated by Creditor Hales" may enter and inspect the Property "on or before October 10, 2026," and that "the third-party inspector will not be accompanied at the inspection by Creditor Hales or his counsel." My cause of concern is the "Inspector" is/was a client of Randall Mark Shochet, could be biased and gave misinformation to and proven by Jeremy Hales who spread it to his audience of over 25k viewers from his Livestream on October 18, 2026. Exhibit 17 link provided.

**9.** Paragraph 5 addresses confidentiality and dissemination of photographs taken during the inspection. It permits access by the Debtor, the Trustee, Creditor Hales, and their respective counsel, while restricting further disclosure. I recognize that the order itself permits Mr. Hales and his counsel to receive covered photographs. My concern is whether covered material was then used publicly. The order's complete text governs its scope and any limits on who could attend the inspection.

**10.** On October 11, 2026, I saw a thumbnail on the YouTube channel identified as "What the Hales" promoting a livestream titled "Trick OR Treat with ONLY ME... Live Updates." The thumbnail displayed Mr. Hales prominently and included a separate image of me and fencing that I recognize as fencing on my Property.

**11.** Exhibit 3 identifies the screenshot of that thumbnail captured on October 11, with a recorded capture time of 7:31 p.m. By approximately 11:00 p.m. that evening, after the inspection-origin concern had been raised publicly, the thumbnail had changed. The sequence is relevant to preserving both versions; I cannot establish from the change alone why it was made.

**12.** I believe the inserted image of me may have come from the October 9 inspection. The appearance shown is consistent with my more recent appearance: my hair is longer, my mustache is grayer, and I have gained some weight compared with earlier photographs. I also recognize the location. To my knowledge, based on my observations, Mr. Hales had not been near the Property or street for months.

**13.** Those circumstances are the basis for my concern. I did not see the original file used to create the thumbnail, do not possess its complete transmission history, and cannot identify from the posted composite alone who selected or uploaded it. I request an examination of the original image, its metadata, and the records showing how it reached the channel.

**C. The October 9 inspection**

**14.** On Friday, October 9, 2026, at approximately 4:15 p.m., I allowed a man who Ms. Preston told me was an assessor sent by the Trustee's side to enter the Property. The visit lasted approximately thirty minutes.

**15.** Ms. Preston told me that her attorney, Jerome Ramsaran, had communicated with her about the inspection and that it was court ordered. My understanding was that the arrangements involved the attorneys in the bankruptcy case. I did not personally hear every communication among those attorneys, and I do not claim personal knowledge of what the Trustee's counsel told Mr. Ramsaran. Ms. Preston told me the Trustee's counsel had described the visit as an assessment of the Property.

**16.** I allowed entry because I understood that the visit was for a legitimate, court-related property inspection subject to confidentiality restrictions. I did not give permission for photographs obtained through that access to be used as public entertainment, advertising, or commentary about me.

**17.** The visitor told us that Randall Shochet had instructed him to come to the Property to take pictures. I report that statement because I heard it. I do not have his retention documents and cannot independently establish who retained, paid, or instructed him.

**18.** During the visit he did not show me identification, give me a business card, identify an employer, state a professional license number, or show me an engagement letter or other paperwork.

**19.** He arrived in a white, four-door Dodge Ram pickup truck. A woman who appeared to be of a similar age remained a passenger in the vehicle. I do not know her name. The man appeared to be in his sixties, had a bald head and a full gray beard, was heavyset, and wore a light blue plaid shirt and tan pants. I provide those observations to assist identification.

**20.** At first, he did not identify particular features he needed to inspect. When Ms. Preston asked whether he wanted to see the house, septic system, and lift station, he responded, "I guess so." He then viewed areas she brought to his attention.

**21.** During the visit he sought photographs of private areas, personal items, and debris on the ground. Near the end, he stated that he had really been told to film the tortoise area and determine what equipment went with the tortoises. Access to that area was denied.

**22.** I dispute that the inspection authorized unrestricted access to every animal, item of equipment, or private area on the Property. I request clarification of the authorized scope of inspection. I do not ask the Court to resolve ownership or exemption of the tortoises merely from this declaration.

**23.** The visitor's statements and focus concerned me because they did not match the inspection purpose that had been conveyed to me. I want to know what instructions he received and where the photographs and recordings went.

**24.** My security system recorded the visitor at the Property. The recording also shows me wearing a shirt during the visit. Exhibit 13 identifies the relevant security footage and any still frames offered from it. The original recording should be preserved and compared with the images that later appeared online.

**D. The visitor's identity**

**25.** The man who entered the Property on October 9, 2026 introduced himself to Ms. Preston as "William Gosling." I have since learned that his name is William John Gosney. I learned this from Jerome Rmsaran today, October 20, 2026. I report the name he gave me only as what I heard.

**26. Exhibit 17-A** is a Florida Department of Financial Services licensee record that I retrieved on October 20, 2026 at 11:14 a.m. from licenseesearch.fldfs.com. It shows that William John Gosney holds license no. W094499 as an Adjuster - All Lines (0620), issued September 18, 2018, with an active appointment as an independent adjuster with Griston Claim Management, Inc. (issued May 22, 2026), and a business address in Inglis, Levy County, Florida. Ms. Preston was told that the property was being assessed by an assessor by The Trustee's counsel. I did not hear the Trustee's counsel say this and do not know his exact words. Neither Ms. Preston nor anyone else told me the visitor was an insurance adjuster. The record I retrieved does not show a real estate appraiser license or an assessor's license, and I have not searched other licensing agencies. I do not contend that paragraph 2 of the Protective Order required any particular license.

**27. Exhibit 17-B** is a copy of the Levy County Clerk's online case record that I captured on October 20, 2026 at approximately 12:13 p.m. for *Brenda Gosney and William Gosney v. Phillip Griffith and Kimberly Griffith*, Case No. 2023-CA-0058, Circuit Court, Eighth Judicial Circuit, Levy County, Florida (filed March 8, 2023; status shown as closed). The party list identifies Randall Mark Shochet (Bar No. 959421) as the attorney for plaintiffs Brenda Gosney and William Gosney. It also lists Randall Shochet as a defendant, with Doreen Turner Inkeles as his attorney. The court-event list shows Mr. Shochet as an attorney of record at hearings on October 10, 2023, December 18, 2023, and April 16, 2024, and at later dates. [Confirm every date against the screenshot before filing.]

**28. Exhibit 17-C** is a Notice of Settlement filed April 17, 2026 (Filing No. 246198031) in the same case by Shochet Law Group, stating that the case was settled in its entirety by an agreement executed April 16, 2026. The copy I obtained is marked "Unofficial Document." Its caption lists Mr. Shochet as a counter-defendant and third-party defendant on the Griffiths' counterclaim. I understand that Mr. Shochet was added to that case as a party after it began.

**29.** I rely on Exhibit 17 for the statements in paragraphs 26 through 28. I believe the William Gosney in Exhibit 17-B is the man who came to my Property on October 9. Mr. Ramsaran, counsel for Ms. Preston, has told me that he received the inspector's name today. I do not know what the Trustee's counsel or Ms. Preston's counsel were told about the inspector's prior connection to Mr. Shochet, or whether the Trustee's counsel knew he was designated by Mr. Hales. I do not know who paid him for the visit.

**30.** I do not contend that Mr. Hales's designation of the inspector violated paragraph 2 of the Protective Order. I ask the Court to determine whether the photographs and recordings he obtained have been used only as the order permits.

**E. The competing explanation and other posts**

**31.** In the October 18, 2026 livestream, Mr. Hales disputed that the photograph came from the inspection. He said it was an older photograph from Father's Day in June 2026, taken by a person he identified as his employee, Dianna West, while she was outside the Property. His explanation can be tested by comparison with the original files and recordings.

**32.** I disagree with that explanation based on my recollection of Ms. West driving past, when my back was toward her, and on the appearance shown in the disputed image. Production of the claimed June original and the October inspection originals would allow an objective comparison.

**33.** In the same October 18 livestream, Mr. Hales also said that I was not wearing a shirt during the inspection. My security footage shows otherwise. That footage can address my

clothing and the visitor's conduct, but the clothing comparison alone does not establish the source of every image used in a thumbnail.

**34.** On October 13 and 14, 2026, I saw additional posts from the same channel displaying my name and photograph with a statement that I live in a tent. Exhibit 4 identifies those posts. I offer them as examples of continued public targeting of me. They do not, by themselves, show that a confidential photograph from the Property was disclosed.

**35.** The public use of my image and private surroundings causes me distress and concern about further exposure of material obtained through court-related access. Once posted publicly, an image can be copied and republished beyond the original channel. Changing a thumbnail does not establish that earlier copies have been removed or that the underlying files have been preserved.

**F. Related litigation and limits of my knowledge**

**36.** Mr. Hales has pursued federal litigation against me. In Case No. 1:25-cv-00058-RH-ZCB, the district court's order, ECF No. 186, filed April 24, 2026, directed entry of a Rule 54(b) judgment dismissing all claims against me and the other defendants listed in that order with prejudice for failure to state a claim. Exhibit 5 identifies that operative order and the related judgment, ECF No. 187. Exhibit 6 identifies the earlier report and recommendation, ECF No. 161; it was a recommendation rather than the operative judgment.

**37.** The same federal case later produced an October 4, 2026 order, ECF No. 244, and an October 5 judgment, ECF No. 245, dismissing the claim against Richard Luthmann, Jr. with prejudice under Rule 54(b). Exhibit 7 identifies those records. That disposition concerned Mr. Luthmann; I do not present it as a disposition of every claim against Ms. Preston.

**38.** In this bankruptcy case, the September 25, 2026 order, Doc. 165, limited Mr. Hales's subpoena to nonparty Lisa Lee. It disallowed Requests 3, 4, and 5 as not material, overly broad and burdensome, and unlikely to lead to relevant information. It required limited production on Requests 1 and 2 and denied contempt, attorney's fees, costs, and the other requested relief. Exhibit 15 identifies the complete order.

**39.** These records reinforce my concern that access obtained through litigation should remain confined to the purposes and limits authorized by the Court. I object to using an inspection of my Property to obtain content for a channel that publicly targets me. I ask the Court to determine from the evidence whether that occurred and to enforce its order if it did.

**40.** I understand that Mr. Hales's amended complaint in the bankruptcy adversary proceeding alleges concealed funds or funds held by others. I dispute any assertion that I knowingly concealed my own funds through Lisa Lee or another person. I have no knowledge of anyone holding funds for me or Ms. Preston in the manner alleged. I can testify about my own finances; I cannot attest to all transactions or accounts of Ms. Preston, Ms. Lee, or anyone else.

**41.** To my knowledge, no existing court judgment establishes a financial obligation from Ms. Preston to Mr. Hales or Mr. Shochet. I request that any demand affecting my Property identify its actual legal and factual basis. Any objection to a particular bankruptcy claim should be decided on that claim's record and through the applicable procedure.

**G. Need for prompt, limited relief**

**42.** On October 20, 2026, the Court held the scheduled non-evidentiary hearing and continued the matter to a status hearing on December 15, 2026, at 11:00 a.m. I request that my immediate concerns not wait until then, and that the Court identify when evidence concerning my ownership and the photographs can be heard.

**43.** My concern is that between now and December 15, additional covered images could be disclosed, and original image files, editing records, distribution records, or security footage could be overwritten or lost before the disputed source is examined. I also seek protection against completion of a transaction disposing of my ownership interest before the required process. I request identification of any pending sale request or proposed closing that would affect my interest.

**44.** I request an early hearing and, pending that hearing, directions preserving the disputed files and preventing further public dissemination of material covered by the Protective Order. I request that the Court require, within ten days or a shorter period it directs, disclosure of the October 9 inspector's employer, his engagement terms, the person or entity that retained and instructed him, and the recipients of his photographs or recordings.

**45.** For the image-source question, I request preservation and production through an appropriate confidential procedure of the October 9 originals, the claimed June original, both October 11 thumbnail versions, associated metadata, and communications or records documenting their transfer and use. Preservation should precede any removal of public copies so that evidence is not destroyed.

**46.** If the Court finds that a published image was derived from covered inspection material, I request enforcement of the Protective Order, including cessation of further dissemination and removal of covered material from public locations within the responsible party's

control, subject to preservation of the originals for this proceeding. I request notice and a fair opportunity for those concerned to respond.

**47.** As to the Property, I request that no one dispose of my interest without my consent or the authority, procedure, and findings required by 11 U.S.C. § 363(h), and that my rights under § 363(i) and (j) be preserved. I request appropriate interim protection under § 363(e) to the extent applicable. I seek relief for my own interests and do not purport to represent Ms. Preston or any other person.

**48.** I ask for a prompt, focused determination of my ownership protections, the compliance of the October 9 inspection and its resulting materials with the Court's order, and the source of the disputed photographs. I seek relief tied to my Property and to material covered by that order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on October 20, 2026, at Otter Creek, Florida.

________________________________________

John Cook, pro se
151 N. Otter Creek Avenue
Otter Creek, FL 32683
jmcook987@gmail.com

# **Exhibit 1:** Deed

Levy County, FL

Log In or Sign up Search search...

≡ Layers | Map | Search | Results | **Report** | Sales List | Sales Search | Sales Results | Home | Tax Estimator

## ⊟ Summary

| | |
|---|---|
| **ParcelID** | 0197000000 |
| **Location Address(es)** | 151 N OTTER CREEK AVE<br>BRONSON 32621- |
| **Neighborhood** | 03.00 (3) |
| **Legal Description*** | 26-13-15 0001.66 ACRES TRACT IN NE1/4 OF NE1/4 OR BOOK 1610 PAGE 877<br>(Note: *The legal description shown here may be condensed, a full legal description should be obtained from a recorded deed for legal purposes.) |
| **LandUse** | VACANT (0000) |
| **SubdivisionName** | N/A |
| **Sec/Twp/Rng** | 26-13-15 |
| **Tax District** | OTTER CREEK (District OC) |
| **Millage Rate** | 24.1294 |
| **Acreage** | 1.66 |
| **Homestead** | Yes |
| **Ag Classification** | No |

View Map

## ⊟ Owner

| | |
|---|---|
| **Owner Name** | Preston Lynette M.L.A. 50%<br>Cook John M 50% |
| **Mailing Address** | P.O. BOX 27<br>OTTER CREEK, FL 32683 |



Levy County, FL
310 School Street #108
Bronson, FL 32621
8:30 - 4:30 Monday - Friday



**Property Appraiser**
Jason Whistler
352-486-5222

**Contact Us**
Email
352-486-5222

INSTR # 691930, OR BK: 1610 PG: 877, Recorded 11/4/2021 10:20 AM
Rec: $18.50 Deed Doc: $157.50 Danny J. Shipp,Clerk of the Circuit Court Levy FL Deputy Clerk MBASSI

R

EXH 1

Prepared by and return to:
Jonathan L. Innes, Esq.
Bennett Law Center
6735 Conroy Road, Suite 301
Orlando, FL 32835
407-901-3535

Parcel Identification No.

[Space Above This Line For Recording Data]

**THIS DEED HAS BEEN PREPARED FROM INFORMATION PROVIDED BY ONE OR MORE THE PARTIES AND HAS NOT BEEN INDEPENDENTLY VERIFIED OR CONFIRMED BY BENNETT LAW CENTER AND THE PARTIES HAVE NOT AUTHORIZED BENNETT LAW CENTER TO CONDUCT ANY TITLE SEARCH OR OTHER TITLE WORK. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS DEED WAS PREPARED WITHOUT BENEFIT OF A TITLE SEARCH AND THAT TITLE IS CONVEYED SUBJECT TO ANY AND ALL MATTERS OF RECORD.**

Unofficial Copy

# Warranty Deed

**This Indenture** is made effective as of the **13th** day of **October, 2021** between **BIGSISLITTLESIS INC**, a New York corporation, whose address is 600 Broadway Ste 200 #670, Albant, NY, 12207, the grantor, and **Lynette M.L.A. Preston**, a single person, and **John M. Cook**, a single person, whose address is 151 N. Otter Creek Avenue, Otter Creek, FL 32683, collectively the grantee*,

(Whenever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth** that said grantor, for and in consideration of the sum of Twenty Two Thousand Five Hundred Dollars and No Cents ($22,500.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Levy County, Florida**, to-wit:

**Legal Description: A PARCEL OF LAND IN THE NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF SECTION 26, TOWNSHIP 13 SOUTH, RANGE 15 EAST, LEVY COUNTY, FLORIDA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: FOR A POINT OF REFERENCE COMMENCE AT THE NORTHEAST CORNER OF SECTION 26-13-15; THENCE RUN N 89°05'44" W, ALONG THE NORTH LINE OF THE NORTHEAST 1/4 OF SECTION 26, A DISTANCE OF 280.35 FEET TO THE EASTERLY RIGHT OF WAY LINE OF LEVY COUNTY ROAD NO. 303; THENCE S 05°53'22" E, ALONG SAID RIGHT OF WAY LINE, 516.65 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE S 05°53'22" E, ALONG SAID RIGHT OF WAY LINE, 363.35 FEET TO THE SOUTHWEST CORNER OF THAT PARCEL DESCRIBED IN DEED BOOK 75, PAGE 315 OF THE PUBLIC RECORDS OF LEVY COUNTY; THENCE N 84°06'38" E, 182.62 FEET TO THE EAST LINE OF THE NORTHEAST 1/4 OF SECTION 26 AND THE SOUTHEAST**

**CORNER OF SAID PARCEL DESCRIBED IN D.B. 75, PAGE 315; THENCE N 00°33'44" E, ALONG THE EAST LINE OF THE NORTHEAST 1/4, A DISTANCE OF 365.67 FEET; THENCE S 84°06'38" W, 223.71 FEET TO CLOSE ON THE POINT OF BEGINNING.**

**Parcel Identification No. 0197000000**

**Also known as 151 N. Otter Creek Avenue, Otter Creek, FL 32683.**

Subject to taxes for the current 2021 year and subsequent years; covenants, conditions, restrictions, easements, reservations and limitations of record, if any.

Together with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

To Have and to Hold, the same in fee simple forever.

And the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to the end of December 2020.

**In Witness Whereof,** grantor has hereunto set grantor's hand and seal the day and year first above written.

Unofficial Copy

Signed, sealed and delivered in our presence:

Sign: Shakira Nooks
Print: Shakira Nooks

Sign: [signature]
Print: Dorcas Deacon

BIGSISLITTLESIS INC,
a New York corporation

By: [signature] (Seal)
Lashana Thomas, President

DAWN A SPANN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01SP6046433
Qualified in Westchester County
My Commission Expires: 2/25/2023

STATE OF New York
COUNTY Bronx

The foregoing instrument was acknowledged before me by means of __ physical presence of __ online notarization, this 8th day of October, 2021, by Lashana Thomas, President of and on behalf of BIGSISLITTLESIS INC, a New York corporation, who is __ personally known to me, or ✓ has produced a valid driver's license or ________ as identification.

[signature]
Notary Public
Name: Dawn Spann
Commission number (if not legible on seal): ________
My commission expires (if not legible on seal): ________

[Notary seal: DAWN A SPANN, NOTARY PUBLIC, STATE OF NEW YORK, BRONX COUNTY]

# **Exhibit 2** Bankruptcy Protective Order

Exhibit 2

(modified by chambers)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

IN RE:
LYNETTE MICHELLE LACEY ALEXIS PRESTON, Case No. 25-10173-KKS
Chapter 7

Debtor.
______________________________/

**AGREED ORDER ON CONSENT MOTION**
**FOR ENTRY OF PROTECTIVE ORDER (Doc. 166)**

THIS MATTER came before the Court upon the *Debtor's and Creditor Jeremy Hales' Consent Motion for Entry of Agreed Protective Order* (the "Motion") (Doc. 166), filed by Debtor Lynette Preston (the "Debtor") and creditor Jeremy Hales ("Creditor Hales," and together with the Debtor, the "Parties"). The Motion concerns the inspection of the Debtor's real property and residence located at 151 North Otter Creek Avenue, Otter Creek, Florida 32683 (Parcel ID No. 0197000000) (the "Property") in connection with Creditor Hales' pending *Objection to Debtor's Claim of Exemptions Regarding Homestead* (Doc. 26) (the "Homestead Objection"). **The parties submitted an agreed order that was not acceptable to the Court. The instant Order is without prejudice to the parties' rights to seek modification and/or alteration of this Order.**

IT IS ORDERED:

1. The Motion is GRANTED as set forth herein.

2. Inspection. A third-party inspector designated by Creditor Hales, whose name was to be provided to Debtor's attorney and the Trustee's attorney upon execution of the Motion and whose name will not be disclosed to any third party until after the inspection, may enter and inspect the Property at a mutually convenient date and time on or before October 10, 2026 (the "Date of Inspection"). The parties agree that the third-party inspector will not be accompanied at the inspection by Creditor Hales or his counsel.

3. Video / Photographs. During the inspection, the inspector may take still photographs and video of the Property (collectively the "Photographs") as the inspector deems necessary.

4. Copies of Photographs. A complete copy of all Photographs taken on the Date of Inspection shall be provided to counsel for the Debtor, counsel for Hales, and counsel for the Chapter 7 Trustee. No copies, summaries, or abstracts of the confidential photographs shall be made for distribution or use by persons other than those persons identified in Paragraphs 4 and 5 herein.

5. Confidentiality; No Dissemination. All Photographs taken during on the Date of Inspection (the "Photographs") shall be treated as confidential and shall not be disseminated, shown, published, or disclosed to any person or entity other than the Debtor, the Trustee, and Creditor Hales, and their respective counsel. Persons permitted access to the Photographs shall not disclose, show, provide, or convey the photographs or information related to the Photographs to any person. If

any of the Photographs are used in a deposition, all portions of the transcripts of such deposition which refer or relate to such confidential materials shall be treated as confidential pursuant to the terms of the protective order and shall be bound separately.

6. Thirty-Day Resolution Period. For a period of thirty (30) days following the Date of Inspection, the Parties shall attempt in good faith to resolve the Homestead Objection by written settlement agreement. During that period, the Photographs shall be used solely in furtherance of that effort and shall remain subject to the confidentiality restriction set forth in Paragraph 5. If the parties reach a resolution by written settlement agreement during this time period, the Photographs shall remain subject to the confidentiality restriction set forth in Paragraph 5 indefinitely.

7. Request to Restrict Access. Bankruptcy Proceedings and Adversary Proceedings are public records. There is a strong presumption that favors public disclosure as being "instrumental in securing the integrity of the [judicial] process." Chicago Trib. Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1311 (11th Cir. 2001); see also In re Yearby, 2026 WL 2501606 (Bankr. S.D. Ga. 2026). Section 107 of the Bankruptcy Code describes this presumption and what types of matters that parties typically request to restrict access. See 11 U.S.C. §107. At this time, the parties are bound by the confidentiality restriction set forth in Paragraph 5 and no

party shall file the Photographs with this Court unless approved by order of this Court.

8. Permitted Use After Thirty Days. If the Parties do not reach a resolution by written settlement agreement of the Homestead Objection within the thirty (30) day period, any party may file a motion with this Court to waive the confidentiality restriction set forth in Paragraph 5 above. Any such motion will not include the Photographs and must set forth the basis and need for any filing to occur under seal. Until such time as this Court rules on any motion filed, the Photographs will remain subject to the confidentiality restriction set forth in Paragraph 5.

9. Retention of Jurisdiction. The Court retains jurisdiction to interpret and enforce the terms of this Order.

DONE AND ORDERED this October 2, 2026.

Mary W. Colón
Chief United States Bankruptcy Judge

Attorney Jerome Ramasaran is directed to serve a copy of this order on interested parties who did not receive service by CM/ECF and file proof of service within 3 business days of entry of the order.

Order prepared by Attorney Ramasarn, LeVine, Shochet and Forsthoefel *(Modified in Chambers)*

END OF DOCUMENT

# **Exhibit 3** Published Thumbnails images

Pic 1 original thumbnails used changed to Pic 2 within 2 hrs on 10/11/26







other thumbnails used since 10/9/26









# **Exhibit 4** Oct. 13th & 14th, 2026 posts






**Exhibit 5** Clerk's Judgment (Doc. 187)

EXH 5

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

**JEREMY BRYAN HALES, et al.,**

**Plaintiffs,**

**v.** **Case No. 1:25-cv-58-RH-ZCB**

**JOHN COOK, et al.,**

**Defendants.**

______________________________/

**CLERK'S JUDGMENT**

Based on Federal Rule of Civil Procedure 54(b), all claims against the defendants John Cook, Bruce P. Matzkin, Lisa Lee a/k/a Lisa Weeks, Marla Hughes, Patti Diagostino Plummer, David C. Helm, Robert J. Keszey, David Michael Teschendorf, and Raymond G. Bonebrake, Jr. are dismissed with prejudice for failure to state a claim on which relief can be granted.

JESSICA J. LYUBLANOVITS
CLERK OF COURT

s/ TiAnn Stark
Deputy Clerk: TiAnn Stark

April 24, 2026
Date

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

EXH 5

JEREMY BRYAN HALES et al.,

Plaintiffs,

v. CASE NO. 1:25cv58-RH-ZCB

JOHN COOK et al.,

Defendants.

_______________________________/

**ORDER GRANTING LEAVE TO FILE A THIRD AMENDED COMPLAINT AGAINST TWO DEFENDANTS AND DIRECTING ENTRY OF JUDGMENT FOR THE OTHER DEFENDANTS**

The plaintiff Jeremy Bryan Hales filed this action against ten defendants: Lynette Michelle Lacy Alexis Preston, John Cook, Bruce P. Matzkin, Lisa Weeks a/k/a Lisa Lee, Marla Hughes, Patti Diagostino Plummer, David C. Helm, Robert J. Keszey, David Michael Teschendorf, and John Doe a/k/a Ray Bonecrusher@raybonecrusher4516.

A first amended complaint, ECF No. 35, added a second plaintiff, Elephant Shoe, LLC, dropped Ms. Plummer as a defendant, and added a new defendant, Richard Luthmann, Jr.

A second amended complaint, ECF No. 76, had the same plaintiffs and defendants with changes in the designation of two defendants: the defendant previously referred to as Lisa Weeks a/k/a Lisa Lee was now referred to as Lisa Lee, and the defendant previously referred to as John Doe with an a/k/a was now referred to as Raymond G. Bonebrake, Jr.

The motions of eight defendants—all but Ms. Preston and Mr. Luthmann—were granted in an order dated March 11, 2026. Mr. Luthmann had been defaulted, had moved to vacate the default, and had not moved to dismiss at that time. Ms. Preston was in bankruptcy, so the claims against her had been stayed.

The March 11 order granted leave to file a third amended complaint by April 2, 2026. The plaintiffs did not file a third amended complaint by the deadline. But on April 16, one plaintiff, Mr. Hales, moved for leave to file a third amended complaint naming only two defendants, Ms. Preston and Mr. Luthmann. Mr. Luthmann responded, ECF No. 185, inappropriately attaching an email to opposing counsel rather than simply filing a response with the court.

This order grants leave to file the third amended complaint but, because of the bankruptcy proceeding, simultaneously confirms that proceedings against Ms. Preston remain stayed. Whether the third amended complaint can properly be filed against her at all may be unclear, but the litigation can properly go forward against the other defendant. Leaving the second amended complaint pending against her

while proceeding on a third amended complaint against the other defendant would undermine, rather than serve, the purposes of the bankruptcy stay.

As set out in the March 11 order, the second amended complaint fails to state a claim against the other eight defendants. The deadline for a further amended complaint against those defendants has passed. There is no reason to keep them in the litigation. I expressly determine that there is no just reason for delay and direct the clerk to enter judgment as provided below.

IT IS ORDERED:

1. The motion, ECF No. 182, for leave to file the third amended complaint is granted. The third amended complaint, ECF No. 182-1, is deemed filed as of April 23, 2026.

2. The clerk must enter judgment stating, "Based on Federal Rule of Civil Procedure 54(b), all claims against the defendants John Cook, Bruce P. Matzkin, Lisa Lee a/k/a Lisa Weeks, Marla Hughes, Patti Diagostino Plummer, David C. Helm, Robert J. Keszey, David Michael Teschendorf, and Raymond G. Bonebrake, Jr. are dismissed with prejudice for failure to state a claim on which relief can be granted."

3. Mr. Helms's motion for judgment on the pleadings, ECF No. 179, is denied as moot.

4. The claims against Ms. Preston and Mr. Luthmann remain pending, but all proceedings against Ms. Preston are stayed.

5. The court retains jurisdiction to award attorney's fees and costs on timely application under Local Rules 54.1 and 54.2.

6. The case is remanded to the magistrate judge for further proceedings.

SO ORDERED on April 23, 2026.

s/Robert L. Hinkle
United States District Judge

**Exhibit 6** Report and Recommendation (Doc. 161)

EX H
6

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ELEPHANT SHOE, LLC, et al.,
Plaintiffs,

vs. Case No.: 1:25cv58/RH/ZCB

JOHN COOK, et al.,
Defendants.
_______________________________/

## REPORT AND RECOMMENDATION

Plaintiffs commenced this case against ten Defendants, eight of whom are proceeding *pro se*. The operative complaint is a sprawling 74-page second amended complaint (with pages and pages of YouTube links) that borders on a shotgun pleading. (Doc. 76). Plaintiffs allege violations of the Lanham Act, along with various state law claims. Currently before the Court are motions to dismiss filed by eight Defendants.[1] (Docs. 52,

---

[1] Defendant Preston filed a motion to dismiss, but she subsequently declared bankruptcy. (Doc. 92). The bankruptcy filing resulted in this case being stayed as to Defendant Preston. (Doc. 94). Thus, Defendant Preston's motion to dismiss is not currently before the Court. Also not before the Court today is the motion to dismiss recently filed by Defendant Luthmann. The Clerk of Court had entered a default against Defendant Luthmann. (Doc. 155). Defendant Luthmann has now appeared and moved to set aside the default and sought dismissal. (Doc. 156). Plaintiffs have just recently responded (Doc. 158), and the Court

53, 55, 61, 106, 107, 110, 127). Plaintiffs have responded in opposition to the motions to dismiss. (Docs. 62, 77, 80, 85, 108, 109, 111, 145). For the reasons below, the motions to dismiss should be granted.

## I. Background[2]

Plaintiff Jeremy Hales owns and operates a business (Plaintiff Elephant Shoe, LLC) that generates revenue by posting content on social media websites like YouTube, Facebook, and TikTok. Plaintiff Hales has over 730,000 subscribers for his "What the Hale$" channel on YouTube and over 327,000 followers for his "What the Hale$" page on Facebook. Additionally, Plaintiff Hales sells stuff he finds in storage units on an auction website called Whatnot.

Defendants are various individuals scattered throughout the United States who Plaintiff Hales claims have joined together to form an "Anti What the Hales Media Ecosystem." This "Ecosystem" allegedly exists to harm Plaintiff Hales's business. Two of the Defendants (Preston and Cook) live near Plaintiff Hales's vacation home in Florida. In this

---

will address Defendant Luthmann's motion at later date after having had time to study the issues raised by the motion and the response.

[2] The information below comes from the factual allegations in Plaintiff's second amended complaint. At this stage, those allegations are accepted as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

lawsuit,[3] Plaintiff Hales alleges that Defendant Preston is liable for malicious prosecution and civil conspiracy (Counts 1 and 8) and that Defendant Cook is liable for civil conspiracy (Count 9).

One of the other Defendants (Matzkin) is an attorney from Massachusetts who previously represented Defendants Preston and Cook in one of the other federal lawsuits filed by Plaintiff Hales. Plaintiff Hales alleges that Defendant Matzkin is liable for tortious interference with business relationships and civil conspiracy (Counts 5 and 7). Defendants Helm, Hughes, Teschendorf, Lee, Keszey, Raymond, and Luthmann are all people (most with their own YouTube channels) who Plaintiff Hales says have engaged in a civil conspiracy to harm his business (Counts 6, 10, 11, 12, 13, 14, 15). Defendant Lee is also alleged to have violated Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) (Count 2), the Lanham Act (Count 3), and to have tortiously interfered with business relationships (Count 4). In addition to civil

[3] Plaintiff Hales has another lawsuit pending in this Court against Defendants Preston and Cook. (1:24cv45). Additionally, Plaintiff Hales filed a different lawsuit in this Court against a state court prosecutor for allegedly not enforcing a civil protection order against Defendants Preston and Cook. (1:25cv920). Chief Judge Winsor recently dismissed that case for failure to state a claim. (Doc. 15, 1:25cv920).

conspiracy, Defendant Luthmann is alleged to have violated Florida's Sexual Cyberharassment Law (Count 16). To help keep that all straight, here is a chart:

| **Defendant** | **Legal Claims** | **Counts** |
|---|---|---|
| Preston | Malicious Prosecution, Civil Conspiracy | 1, 8 |
| Cook | Civil Conspiracy | 9 |
| Lee | FDUTPA, Lanham Act, Tortious Interference, Civil Conspiracy | 2, 3, 4, 6 |
| Matzkin | Tortious Interference, Civil Conspiracy | 5, 7 |
| Hughes | Civil Conspiracy | 10 |
| Helm | Civil Conspiracy | 11 |
| Keszey | Civil Conspiracy | 12 |
| Teschendorf | Civil Conspiracy | 13 |
| Raymond | Civil Conspiracy | 14 |
| Luthmann | Civil Conspiracy, Florida Sexual Cyberharassment Law | 15, 16 |

In terms of relief, Plaintiffs seek monetary damages against all Defendants. Plaintiffs also seek injunctive relief against Defendants Lee and Luthmann.

## II. Procedural History

The original complaint in this case named some of the current Defendants, but not all. (Doc. 1). The claims in the original complaint were defamation, civil conspiracy, tortious interference, and aiding and abetting. Defendant Helm filed a motion for a more definite statement, which led to the Court ordering Hales to file an amended complaint.[4] (Docs. 16, 17). Plaintiffs then filed the first amended complaint. (Doc. 35). Plaintiffs later filed a second amended complaint, which named the current Defendants and asserted claims involving civil conspiracy, tortious interference, FDUTPA, and Florida's Sexual Cyberharassment Law. (Docs. 74, 76). It is the second amended complaint that Defendants now seek to dismiss.

## III. Discussion

In the pending motions to dismiss, Defendants argue that dismissal is warranted under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. To survive a

[4] In granting the motion, the Court instructed Hales's counsel that he should "familiarize himself with the Eleventh Circuit's precedent on 'shotgun pleadings'" before filing the amended complaint. (Doc. 17 at 1 n.1).

motion to dismiss for failure to state a claim, a plaintiff's complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a motion to dismiss must accept the complaint's factual allegations as true, but legal conclusions "are not entitled to the presumption of truth." *Id.* at 678-79.

**A. Defendant Lee's Motion to Dismiss**

The Court will first take up Defendant Lee's motion to dismiss (Doc. 106). As mentioned above, the second amended complaint alleges that Defendant Lee violated the Lanham Act, the FDUTPA, tortiously interfered with business relationships, and participated in a civil conspiracy. Defendant Lee claims that Plaintiffs have failed to state a claim for each of these causes of action.

**1. The FDUTPA**

In Count 2 of the second amended complaint, Plaintiffs claim that Defendant Lee violated the FDUTPA, Fla. Stat. § 501.201, *et seq.* (Doc. 76 at 48). Plaintiffs seek damages and injunctive relief, as well as

attorneys' fees under the FDUTPA. (*Id.* at 50). Defendant Lee argues that dismissal is warranted for failure to state a claim. The Court agrees with Defendant Lee.[5]

The Court will first discuss Plaintiffs' claim for damages under the FDUTPA. To assert a FDUTPA damages claim, a plaintiff must allege "(1) a deceptive or unfair act in the conduct of trade or commerce; (2) causation; and (3) actual damages." *Ounjian v. Globoforce*, 89 F.4th 852, 860 (11th Cir. 2023). Although a plaintiff need not be a consumer to assert a FDUTPA claim, there must be "an injury or detriment to consumers." *Id.* A plaintiff may only recover "actual damages" under the FDUTPA—the statute does not allow "nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Popeyes Louisiana Kitchen, Inc. v. Florida Pop, LLC*, 723 F. Supp. 3d 1196, 1207 (S.D. Fla. 2024). The phrase "actual damages" in the

[5] The parties disagree over whether claims brought under the FDUTPA are subject to the heightened pleading requirements found in Rule 9(b) of the Federal Rules of Civil Procedure. There is a dispute among the district courts in Florida on this issue. *See Tennis v. Bel-Mac Roofing, Inc.*, No. 3:17cv14, 2018 WL 11504986, at *3 (N.D. Fla. Mar. 28, 2018) (discussing the split). It is unnecessary to weigh in on that dispute today because the FDUTPA claim does not survive under the normal pleading standard found in Rule 8.

FDUTPA context is a "term of art." *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1191 (M.D. Fla. 2022). The "sole permissible measure" of actual damages is "the difference in market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Id.* The phrase "actual damages" for FDUTPA purposes does not include consequential damages or lost profits. *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017). Dismissal of an FDUTPA claim is warranted if the complaint fails to plausibly allege actual damages. *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1101 (11th Cir. 2021) (affirming dismissal of FDUTPA because the plaintiff "has not pled a plausible claim for actual damages under the FDUPTA").

Looking to Plaintiffs' second amended complaint, it fails to plausibly allege actual damages caused by Defendant Lee's violation of the FDUTPA. Indeed, Plaintiffs' claims are "ill-suited to the requirements of the FDUTPA" because "this case does not involve a product or service, much less the delivery of that product or service in a manner that was not contemplated under a contract." *Popeyes Louisiana*

*Kitchen, Inc.*, 723 F. Supp. 3d at 1207. Thus, the allegations in the second amended complaint provide no basis for determining that "actual damages"—as that phrase has been interpreted for FDUTPA purposes—were caused by Defendant Lee's alleged conduct. The second amended complaint simply states in conclusory fashion that Defendant Lee's "deceptive and unfair trade practices" caused Plaintiffs to "suffer[] actual damages." (Doc. 76 at 49). But such conclusory allegations are insufficient to state a plausible FDUTPA damages claim. *Marrache*, 17 F.4th at 1101.

Plaintiffs claim that they are entitled to $959,000 in damages for the alleged FDUTPA violation (Doc. 76 at 50), but the second amended complaint fails to explain how that amount constituted "the difference in market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Farmer*, 582 F. Supp. 3d at 1191. Accordingly, the FDUTPA damages claim against Defendant Lee in Count 2 should be dismissed.

Similarly, Plaintiffs request for injunctive relief under the FDUTPA should be dismissed. In the FDUTPA context, "injunctive relief

is not a standalone cause of action." *CMR Construction & Roofing, LLC v. UCMS, LLC*, No. 21-11183, 2022 WL 3012298, at *5 (11th Cir. July 29, 2022). Rather, it "is a remedy for a violation of FDUTPA." *Id.* "To state a claim for injunctive relief under FDUTPA, a plaintiff must allege (1) a deceptive or unfair act or practice in trade and (2) that plaintiff is a person aggrieved by the deceptive act or practice." *Id.* at *3 (cleaned up). Looking to the first requirement, "an act is not deceptive and a practice is not unfair unless a consumer was actually aggrieved by the act or practice." *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1302 (M.D. Fla. 2017). Although a non-consumer may assert a FDUTPA claim "the plaintiff must allege that the relevant act or practice was harmful to a consumer." *CMR Construction & Roofing, LLC*, 2022 WL 3012298, at *3.

Here, Plaintiffs have failed to plausibly allege that a consumer was actually aggrieved by a deceptive or unfair practice committed by Defendant Lee. The allegations in the second amended complaint are about conduct by Defendant Lee that was allegedly injurious to Plaintiffs—not to consumers. *See Ounjian v. Globoforce, Inc.*, No. 3:22cv4575, 2022 WL 3223997, at *5 (N.D. Fla. July 18, 2022) (dismissing

FDUTPA claim because the allegations were about conduct "allegedly committed against [the non-consumer plaintiff], not the unfair practices committed against consumers" (emphasis in original)). Although Plaintiffs have stated the conclusion that a consumer was aggrieved, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At the end of the day, the FDUTPA is a consumer protection statute that was designed to protect consumers from unfair and deceptive trade practices. *Taft v. Dade Cnty. Bar Assoc., Inc.*, No. 1:15-cv-22072, 2015 WL 5771811, at *3 (S.D. Fla. Oct. 2, 2015). It is clear to the Court that the allegations in the second amended complaint are not aimed at vindicating consumers who were harmed by Defendant Lee's conduct. Because Plaintiffs have not plausibly alleged an FDUTPA claim, the claim for injunctive relief against Defendant Lee should be dismissed.

**2. Lanham Act**

In Count 3 of the second amended complaint, Plaintiffs claim that Defendant Lee violated sections 32 and 43(a) of the Lanham Act (15 U.S.C. §§ 1125(a), 1125(a)(1)(A). (Doc. 76 at 51). "The Lanham Act was

intended to make actionable the deceptive and misleading use of marks, and to protect persons engaged in commerce against unfair competition." *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003) (cleaned up). The Lanham Act contains numerous causes of action. *Alexander v. Fla. State Univ.*, 4:25cv5, 2025 WL 3177578, at *2 (N.D. Fla. Oct. 27, 2025). Because of that, "a plaintiff who asserts a claim pursuant to § 1125 must specify the type of claim he seeks to assert." *Id.* In the second amended complaint, Plaintiffs specify that Defendant Lee "violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)" and "violated Section 32 of the Lanham Act, 15 U.S.C. § 1125(a)[.]" (Doc. 76 at 51).

Section 43(a), 15 U.S.C. § 1125(a)(1)(A), "forbids unfair trade practices involving infringement of trade dress, service marks, or trademarks, even in the absence of federal trademark registration." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001). To prevail on a claim under § 1125(a)(1)(A), a plaintiff must show "(1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two."

*Id.* Satisfying the first element requires "proof of a valid trademark[,]" but "a plaintiff need not have a registered mark." *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010). Instead, the Eleventh Circuit has said that "the use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." *Id.*

Looking to the allegations in the second amended complaint, Plaintiffs have failed to plausibly allege either element of a claim under § 1125(a)(1)(A). Plaintiffs have not plausibly alleged they had "prior rights" to any trademark—registered or common law. Indeed, the second amended complaint's factual allegations say nothing about Plaintiffs having a trademark. Thus, Plaintiffs have not plausibly alleged facts sufficient to establish the first element of a claim under § 1125(a)(1)(A).

They also have not plausibly alleged facts sufficient to establish the second element of a claim under § 1125(a)(1)(A). More specifically, the allegations in the second amended complaint fail to plausibly allege that Defendant Lee "adopted a mark or name that was the same, or

confusingly similar to [Plaintiffs'] mark, such that consumers were likely to confuse the two." *Planetary*, 261 F.3d at 1193. The second element of a claim under § 1125(a)(1)(A) is all about showing a likelihood of consumer confusion between the plaintiff's mark and the mark used by the defendant. Here, there are no factual allegations from which the Court could reasonably infer that Defendant Lee has a mark—registered or otherwise. Even if there were such factual allegations, there is nothing in the second amended complaint that could lead the Court to draw the reasonable inference that Defendant Lee "employed marks that were similar enough to [Plaintiffs'] to create a likelihood of confusion." *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1375 (M.D. Fla. 2008). Accordingly, Plaintiffs have failed to state a plausible claim that Defendant Lee "violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)" as alleged in the second amended complaint. (Doc. 76 at 51).

The same is true with respect to Plaintiffs' claim that Defendant Lee "willfully violated Section 32 of the Lanham Act, 15 U.S.C. § 1125(a)." (Doc. 76 at 51). First, the Court would note that Section 32 of the Lanham Act is not codified at 15 U.S.C. § 1125(a) as stated in the second amended

complaint. Instead, Section 32 of the Lanham Act is actually codified at 15 U.S.C. § 1114. *See Savannah College of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261 (11th Cir. 2017) (recognizing that "§ 32(a) of the [Lanham] Act" was "codified at 15 U.S.C. § 1114(1)(a)"). So, the Court assumes that Plaintiffs meant to cite 15 U.S.C. § 1114 instead of 15 U.S.C. § 1125(a) when referring to the alleged violation of Section 32 of the Lanham Act.[6]

To succeed on a claim under 15 U.S.C. § 1114, "a plaintiff must demonstrate (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion." *Frehling Enterprises, Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Unlike a claim under 15 U.S.C. § 1125(a), a claim under 15 U.S.C. § 1114 requires the plaintiff to have a federally registered trademark. *See Weinacker v. Wahl Clipper Corp.*, No. 23-12782, 2024 WL 2796533, at *2 (11th Cir.

---

[6] This arguably makes Plaintiffs' second amended complaint a shotgun pleading because Plaintiffs are asserting two separate legal claims in the same count count—i.e., a claim under 15 U.S.C. § 1125(a)(1)(A) and a claim under 15 U.S.C. § 1114. *See Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021) (stating that a complaint is a shotgun pleading if "does not separate each cause of action or claim for relief into a different count" (cleaned up)). Nonetheless, the Court would prefer to resolve this dispute on the merits instead of shotgun pleading grounds.

May 31, 2024) (explaining that "§ 1114 only applies to registered trademarks"); *see also Savannah College*, 872 F.3d at 1261 (recognizing that a claim under § 1114 "lies only for federally-registered marks").

Turning to the allegations in the second amended complaint, Plaintiffs have not alleged that they had a registered trademark with the U.S. Patent and Trademark Office. That is fatal to their claim that Defendant Lee violated Section 32 of the Lanham Act, 15 U.S.C. § 1114. *See Weinacker*, 2024 WL 2796533, at *2 (affirming dismissal of claim under § 1114 because the plaintiff "did not allege that he held an active registered trademark with the United States Patent and Trademark Office"). Even if Plaintiffs had alleged that they had a federally registered trademark, the claim would still be subject to dismissal because the second amended complaint fails to plausibly allege a likelihood of confusion. A claim under § 1114 requires the use of a trademark in commerce that is "likely to cause confusion." *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1070 (11th Cir. 2023). Liability for a violation "turns on whether the junior user's mark is likely to cause confusion with the senior user's mark." *Id.* (cleaned up). The second amended complaint fails to plausibly allege that Defendant

Lee used a mark that caused a likelihood of confusion with a registered mark belonging to Plaintiffs. Thus, Plaintiffs have failed to state a claim against Defendant Lee under 15 U.S.C. § 1114.

There is one more thing to discuss, at least briefly, regarding Count 3. In the second amended complaint, the title of Count 3 references "false advertising." (Doc. 76 at 51). But neither of the statutory provisions (i.e., 15 U.S.C. §§ 1114 and 1125(a)(1)(A)) that Plaintiffs specifically say that Defendant Lee violated in the body of Count 3 deal with false advertising. Plaintiffs are represented by counsel, so this Court need not liberally construe the complaint as it does for *pro se* litigants. *In re Keitel*, 852 F. App'x 463, 464 n.1 (11th Cir. 2021). Moreover, it is not this Court's role to rewrite a deficient complaint or to guess about what claims a plaintiff (especially a represented one) intended to bring. Thus, the Court need not address whether Plaintiffs have plausibly alleged a false advertising claim because the second amended complaint does not actually assert such a claim. Instead, it asserts that Defendant Lee "violated" 15 U.S.C. §§ 1114 and 1125(a)(1)(A)—neither of which address false advertising.

Nonetheless, to the extent Plaintiffs intended to bring a claim of false advertising under a provision of the Lanham Act that they have not

cited, such a claim would be subject to dismissal. To succeed on a false advertising claim under 15 U.S.C. § 1125(a)(1)(B), "a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).

Here, Plaintiffs have not plausibly alleged that Defendant Lee used false and misleading advertisements that deceived or had the capacity to deceive consumers. Unlike advertisements, the statements allegedly made by Defendant Lee on YouTube and/or other social media outlets "do not propose a commercial transaction." *Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (rejecting claim that blog posts that were critical of the plaintiff's medical practice constituted false advertising in violation of the Lanham Act); *see also Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (stating that for Lanham Act false advertising claim an advertisement must be commercial speech, and "[c]ommercial

speech is speech which does no more than propose a commercial transaction"). Instead, what Defendant Lee is alleged to have done would be better described as "communicat[ing] information, express[ing] opinion, and recit[ing] grievances" regarding Plaintiffs. *Tobinick*, 848 F.3d at 950; *see also Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013) ("The mere fact that the parties may compete in the marketplace of ideas is not sufficient to invoke the Lanham Act."); *Podiatrist Assoc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 18-20 (1st Cir. 2003) (affirming dismissal of Lanham Act false advertising claim that was based on the defendant's allegedly false and disparaging comments regarding podiatrists and the quality of care they provide). The fact that Defendant Lee may have solicited donations or offered premium subscriptions on her YouTube page does not give rise to a cause of action for false advertising under the Lanham Act. *See Tobinick*, 848 F.3d at 952 (rejecting argument that the placement of articles "next to revenue-generating advertising" and "the ability of a reader to pay for a website subscription" would be sufficient for articles to be deemed

commercial advertising for Lanham Act purposes). Accordingly, Count 3 of the second amended complaint should be dismissed.[7]

### 3. Tortious Interference

In Count 4, Plaintiffs allege Defendant Lee tortiously interfered with business relationships. "Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001).

---

[7] Any doubt about whether Plaintiff has stated a plausible claim under the Lanham Act can be resolved by considering the purposes of the Lanham Act. The Act was designed to (1) make "actionable the deceptive and misleading use of marks" in interstate commerce; (2) "to protect registered marks used in such commerce from interference by State, or territorial legislation"; (3) "to protect persons engaged in such commerce from unfair competition"; (4) to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks"; and (5) "to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations." 15 U.S.C. § 1127 (describing the purposes of the Lanham Act). The allegations against Defendant Lee in this case in no way seek to vindicate the listed purposes of the Lanham Act.

Here, the second amended complaint alleges that Plaintiffs had a business relationship with YouTube and Whatnot, as well as "other companies" and unspecified "customers." (Doc. 76 at 52-53). There is no cause of action for "tortious interference with a business relationship to the community at large." *Coach Servs., Inc. v. 777 Lucky Access., Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010).

Additionally, a tortious interference claim requires the plaintiff to show a "business relationship with identifiable customers." *Id.* Plaintiffs' second amended complaint does not identify any customers—it simply generically refers to "customers." That is insufficient to state a claim—the same is true with regard to the Plaintiffs' allegations involving their business relationships with "other" unidentified companies. *See id.* (dismissing tortious interference claim because allegation that the defendant interfered with sales to "various customers" was "too vague and abstract to satisfy the first element of a tortious interference claim"); *see also Kamau v. Slate*, No. 4:21cv279, 2023 WL 3142306, at *2 (N.D. Fla. Jan. 17, 2023) ("When pleading the existence of a business relationship, plaintiffs must specifically identify in their

complaint the customers or clients that are the subject of a defendant's alleged interference.").

As for the allegations regarding YouTube and Whatnot, Plaintiffs have alleged existing and specific business relationships. So, the first element of a tortious interference has been plausibly alleged. And the Court will assume that Plaintiffs' general statement about Defendant Lee's knowledge of those business relationships is sufficient to satisfy the second element. *See generally Sun Life Assurance Co. of Canada v. Imperial Premium Finance, LLC*, 904 F.3d 1197, 1215-16 (11th Cir. 2018) (finding that the defendant's knowledge of business relationship need not be pleaded with specificity).

That leads to the third element, which is where Plaintiffs have a problem because they have not plausibly alleged that Defendant Lee intentionally and unjustifiably interfered with Plaintiffs' business relationships with YouTube and/or Whatnot. Although there are allegations that Defendant Lee posted content about Plaintiffs on her own YouTube channel, Plaintiffs have not plausibly alleged that Defendant Lee contacted YouTube or Whatnot representatives or otherwise did anything to interfere with the business relationship that

Plaintiffs had with YouTube and Whatnot. *See Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1281 (11th Cir. 2015) (affirming dismissal where there was no allegation that the defendant "conveyed" the information in question to the entity with which the plaintiff had a business relationship). Nor is there any allegation that because of Defendant Lee's conduct YouTube or Whatnot terminated or otherwise altered their business relationship with Plaintiffs. Thus, Plaintiffs have failed to plausibly allege the third element of a tortious interference with business relationships claim.

Plaintiffs have also failed to plausibly allege the last element—damages. Damages are "an essential element of a tortious interference claim." *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir. 1994). Thus, dismissal is warranted if a plaintiff fails to plausibly allege damages suffered "as a result of the breach of the business relationship." *Balesia Tech., Inc. v. Cuellar*, 22-CV-62085, 2023 WL 6304488, at *3 (S.D. Fla. Sept. 28, 2023). This means that the plaintiff must "connect the loss" of a business relationship "to the alleged tortious conduct" of the defendant. *Bayley Prods., Inc. v. Cole*, 720 So.2d 550, 551 (Fla. 4th DCA 1998).

Here, Plaintiffs seek $1,835,000 in damages for Defendant Lee's tortious interference. (Doc. 76 at 52). But the allegations in the second amended complaint fail to plausibly connect Defendant Lee's supposed tortious interference to the breach or loss of any business relationship with YouTube or Whatnot. Nor does the second amended complaint allege the value of any such business relationship that was lost or breached as a result of Defendant Lee's conduct. Thus, Plaintiffs have failed to plausibly allege the fourth element of a tortious interference claim. Because Plaintiffs have failed to plausibly allege several elements of a tortious interference with business relationships claim, Count 4 should be dismissed.

**4. Civil Conspiracy**

In Count 6, Plaintiffs claim Defendant Lee engaged in a civil conspiracy. "Under Florida law, the elements of a civil conspiracy are: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Rashada v. Hathcock*, 780 F. Supp. 3d 1212, 1230 (N.D. Fla. 2025) (cleaned up). The "gravamen of a civil

conspiracy claim" in Florida is "the underlying tort carried out by virtue of the conspiracy, not the conspiratorial agreement itself." *Id.* at 1231. This means that "if there is no actionable underlying tort, a civil conspiracy claim will fail." *Id.*; *see also Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018) ("An actionable conspiracy requires an actionable underlying tort or wrong.").

According to the second amended complaint, Defendant Lee is alleged to have conspired with others to violate the FDUTPA, the Lanham Act, and to tortiously interfere with business relationships. As explained above, those claims are subject to dismissal for failure to state a plausible claim. And because the underlying claims fail, the civil conspiracy claim necessarily fails. *See Alhassid v. Bank of Am, N.A.*, 60 F. Supp. 3d 1302, 1317 (S.D. Fla. 2014) (stating that because the underlying claims "do not survive this Motion to Dismiss, they cannot substantiate Plaintiffs' civil conspiracy claim"); *see also Rebman v. Follett Higher Educ. Group, Inc.*, 575 F. Supp. 2d 1272, 1280 (M.D. Fla. 2008) (explaining that "because the underlying breach of contract and FDUTPA

claims fail, so must the civil conspiracy claim"). Accordingly, the civil conspiracy claim against Defendant Lee in Count 6 should be dismissed.[8]

### B. Defendant Matzkin's Motion to Dismiss

Having resolved Defendant Lee's motion to dismiss, the Court will now turn to Defendant Matzkin's motion to dismiss (Doc. 55). The second

---

[8] Even if the second amended complaint had stated a plausible underlying claim, the civil conspiracy claim would still be subject to dismissal for failure to state a claim. A civil conspiracy claim "must contain clear, positive and specific allegations; general allegations of conspiracy are not sufficient." *Parisi v. Kingston*, 314 So.3d 656, 661 (Fla. 3d DCA 2021). It is insufficient for a complaint to "vaguely tie[] . . . events together by alleging, in conclusory fashion, that the circumstances unfolded pursuant to an agreement" between the defendants. *Id.* at 662; *see also Harper v. Fla. Bar*, No. 4:13-cv-459, 2013 WL 5970698, at *4 (N.D. Fla. Nov. 8, 2013) ("Plaintiff may not broadly allege that all Defendants conspired together without specific statements of fact which support the claim. Conclusory, vague, and general allegations of conspiracy justify dismissal."). Here, instead of "clear, positive[,] and specific allegations[,]" *Parisi*, 314 So. 3d at 661, the second amended complaint, contains "[c]onclusory allegations of an agreement, without any factual basis to make the allegations plausible[.]" *N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty.*, 418 F. Supp. 3d 957, 999 (N.D. Fla. Sept. 30, 2019). The second amended complaint alleges a sprawling conspiracy involving people from across the United States, all of whom share one thing in common—they have said negative things about Plaintiff Hales on social media. But there are insufficient facts alleged to plausibly show an agreement between all the members of the supposed conspiracy to engage in an unlawful act or a lawful act by unlawful means. Thus, dismissal is warranted. *See Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy.").

amended complaint alleges Defendant Matzkin tortiously interfered with Plaintiffs' business relationships (Count 5) and also participated in a civil conspiracy (Count 7).

**1. Tortious Interference**

The law regarding what is necessary to state a claim for tortious interference is set forth above and will not be repeated here. The second amended complaint alleges that Defendant Matzkin tortiously interfered with Plaintiffs' "contracts and advantageous business relationships with its customers and other companies including, without limitation, Whatnot, Inc. and YouTube." (Doc. 76 at 54). Defendant Matzkin argues that Plaintiffs' allegations are insufficient to state a plausible tortious interference claim. The Court agrees with Defendant Matzkin.

First, as explained above with regard to Defendant Lee, a tortious interference claim requires the plaintiff to show a "business relationship with identifiable customers." *Coach Servs., Inc.*, 752 F. Supp. 2d at 1273. Here, Plaintiffs' second amended complaint does not identify any customers—it simply generically refers to "customers." That is insufficient to state a claim—the same is true with regard to the Plaintiffs' allegations involving its business relationships with "other"

unidentified companies. *See id.* (dismissing tortious interference claim because allegation that the defendant interfered with sales to "various customers" was "too vague and abstract to satisfy the first element of a tortious in interference claim"); *see also Kamau*, 2023 WL 3142306, at *2 ("When pleading the existence of a business relationship, plaintiffs must specifically identify in their complaint the customers or clients that are the subject of a defendant's alleged interference."). Thus, Plaintiffs have failed to plausibly allege that Defendant Matzkin tortiously interfered with Plaintiffs' business relationships with its unspecified customers and unidentified companies.

Regarding the allegations involving Whatnot and YouTube, Plaintiff has alleged existing and specific business relationships. So, the first element of a tortious interference has been plausibly alleged. And Plaintiffs have plausibly alleged that Defendant Matzkin had knowledge of those business relationships.

That leads to the third element, which is again where Plaintiffs have a problem because the second amended complaint fails to plausibly allege that Defendant Matzkin intentionally and unjustifiably interfered with Plaintiffs' business relationships with YouTube and/or Whatnot.

Although there are allegations that Defendant Matzkin posted content about Plaintiff Hales on YouTube, Plaintiffs have not plausibly alleged that Defendant Matzkin contacted YouTube representatives or otherwise did anything to interfere with the business relationship that Plaintiffs allegedly had with YouTube. *See Duty Free Americas, Inc.*, 797 F.3d at 1281-82 (affirming dismissal where there was no allegation that the defendant "conveyed" the information in question to the entity with which the plaintiff had a business relationship).

As for Whatnot, Plaintiffs have alleged that Defendant Matzkin had contact with a Whatnot representative during an email exchange regarding discovery in one of the other cases Plaintiff Hales has filed. But Plaintiffs have failed to plausibly allege that this contact with a Whatnot representative actually interfered with Plaintiffs' business relationship with Whatnot. More specifically, there are no allegations that Whatnot terminated its contract with Plaintiffs, denied Plaintiffs access to the Whatnot platform, or otherwise altered Plaintiffs' business relationship with Whatnot as a result of Defendant Matzkin's conduct. *See Tietig v. Southeast Reg. Const. Corp.*, 557 So. 2d 98, 99 (Fla. 3d DCA 1990) (explaining that the "lack of a causal relationship between the

alleged 'interference' and the failure of the agreement . . . precludes recovery as a matter of law"). Thus, Plaintiffs have failed to plausibly allege the third element of a tortious interference with business relationships claim regarding Whatnot.

Plaintiffs have also failed to plausibly allege the last element—damages. Damages are "an essential element of a tortious interference claim." *Worldwide Primates, Inc.*, 26 F.3d at 1092. Thus, dismissal is warranted if a plaintiff fails to plausibly allege damages suffered "as a result of the breach of the business relationship." *Balesia Tech., Inc.*, 2023 WL 6304488, at *3. This means that the plaintiff must "connect the loss" of a business relationship "to the alleged tortious conduct" of the defendant. *Bayley Prods., Inc.*, 720 So. 2d at 551.

Here, Plaintiffs seek $1,229,000 in damages for Defendant Matzkin's tortious interference. (Doc. 76 at 53). But the allegations in the second amended complaint fail to plausibly connect Defendant Matzkin's supposed tortious interference to the breach of any contract or the loss of any business relationship. Nor does the second amended complaint allege the value of any such breached contract or lost business relationship that resulted from Defendant Matzkin's conduct. Thus,

Plaintiffs have failed to plausibly allege the fourth element of a tortious interference claim. Because Plaintiffs have failed to plausibly allege several elements of a tortious interference with business relationships claim, Count 5 should be dismissed.

**2. Civil Conspiracy**

In Count 7, Plaintiffs claim Defendant Matzkin is liable for civil conspiracy. That claim fails for the same reasons discussed above regarding Plaintiffs' civil conspiracy claim against Defendant Lee. Accordingly, Count 7 should be dismissed.

## C. Defendant Cook's Motion to Dismiss

In Count 9, Plaintiffs claim Defendant Cook is liable for civil conspiracy. Defendant Cook has moved to dismiss for failure to state a claim. (Doc. 61). The civil conspiracy claim against Defendant Cook fails for the same reasons discussed above regarding Plaintiffs' civil conspiracy claim against Defendant Lee. Accordingly, Count 9 should be dismissed.

## D. Defendant Hughes's Motion to Dismiss

In Count 10, Plaintiffs claim Defendant Hughes is liable for civil conspiracy. Defendant Hughes has moved to dismiss for failure to state

a claim. (Doc. 53). The civil conspiracy claim against Defendant Hughes fails for the same reasons discussed above regarding Plaintiffs' civil conspiracy claim against Defendant Lee. Accordingly, Count 10 should be dismissed.

### E. Defendant Bonebrake's Motion to Dismiss

In Count 14, Plaintiffs claim Defendant Bonebrake[9] is liable for civil conspiracy. Defendant Bonebrake has moved to dismiss for failure to state a claim. (Doc. 107). The civil conspiracy claim against Defendant Bonebrake fails for the same reasons discussed above regarding Plaintiffs' civil conspiracy claim against Defendant Lee. Accordingly, Count 14 should be dismissed.

### F. Defendant Keszey's Motion to Dismiss

In Count 12, Plaintiffs claim Defendant Keszey is liable for civil conspiracy. Defendant Keszey has moved to dismiss for failure to state a claim. (Doc. 110). The civil conspiracy claim against Defendant Keszey fails for the same reasons discussed above regarding Plaintiffs' civil

[9] Defendant Bonebrake's name is Raymond G. Bonebrake, Jr. (Doc. 107). The second amended complaint refers to him as "Defendant Raymond." (Doc. 76 at 5, 42-43).

conspiracy claim against Defendant Lee. Accordingly, Count 12 should be dismissed.

### G. Defendant Helm's Motion to Dismiss

In Count 11, Plaintiffs claim Defendant Helm is liable for civil conspiracy. Defendant Helm has moved to dismiss for failure to state a claim. (Doc. 52). The civil conspiracy claim against Defendant Helm fails for the same reasons discussed above regarding Plaintiffs' civil conspiracy claim against Defendant Lee. Accordingly, Count 11 should be dismissed.

Aside from seeking dismissal, Defendant Helm seeks to recover his attorneys' fees under Florida's anti-SLAPP statute, Fla. Stat. § 768.295(3)-(4). "Florida's anti-SLAPP statute prohibits a person from filing a cause of action 'against another person or entity [1] without merit and [2] primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue.'" *Parekh v. CBS Corp.*, 820 F. App'x 827, 836 (11th Cir. 2020) (quoting Fla. Stat. § 768.295(3)). It further provides that a court "'shall award the prevailing party reasonable attorney fees and costs incurred in

connection with a claim that an action was filed in violation of this section.'" *Id.* (quoting Fla. Stat. § 768.295(4)).

According to Defendant Helm, the anti-SLAPP statute entitles him to reasonable attorney fees because Plaintiffs' allegations are without merit and this lawsuit was commenced because Defendant Helm exercised his right to free speech by appearing on YouTube broadcasts to discuss Plaintiff Hales and another lawsuit Plaintiff Hales had filed. In response to Defendant Helm's motion to dismiss, Plaintiffs have argued that their claim against Defendant Helm has merit and that Defendant Helm's speech was commercial speech that is not covered by the anti-SLAPP statute. (Doc. 80 at 2-3).

Defendant Helm has met the anti-SLAPP statute's first requirement because, as explained above, Plaintiffs' claim against him lacks merit. Turning to the anti-SLAPP statute's second requirement, the claim must have been brought "primarily because [Defendant Helm] has exercised the constitutional right of free speech in connection with a public issue." *Parekh*, 820 F. App'x at 836. The anti-SLAPP statute defines "free speech in connection with public issues" as:

> [A]ny written or oral statement that is protected under applicable law and [1] is made before a governmental entity

> in connection with an issue under consideration or review by a governmental entity, or [2] is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report or other similar work.

Fla. Stat. § 768.295(2)(a). "Free speech made in connection with public issues, in pertinent part, merely requires a showing that the public speech is contained in or was made in connection with one of the listed media formats or other similar modes for widely disseminating protected First Amendment speech." *Mishiyev v. Davis*, 402 So. 3d 443, 448-49 (Fla. 2d DCA 2025) (cleaned up). Here, the allegations in the second amended complaint involve oral and written statements made by Defendant Helm that were protected under applicable law. The oral statements were made as part Defendant Helm's operation of a YouTube channel called "Making Law Simple." (Doc. 76 at 30). And the written statements were made in connection with a YouTube broadcast that was being conducted by Defendant Lee on her YouTube channel. These YouTube broadcasts are audiovisual works or "similar works." And in the current world, YouTube is undoubtedly an "other similar mode[] for widely disseminating protected First Amendment speech." *Mishiyev*, 402

So. 3d at 449. Thus, the requirements of Florida's anti-SLAPP statute have been met.

In an attempt to avoid this conclusion, Plaintiffs argue in cursory fashion that the anti-SLAPP law does not apply because the lawsuit was aimed at Defendant Helm's "unlawful conduct, which includes but is not limited to actionable commercial speech." (Doc. 80 at 3). Plaintiffs' argument that the allegations against Defendant Helm are based on conduct and not speech is incorrect. The gravamen of Plaintiffs' allegations against Defendant Helm are things he said and wrote—in other words, his speech. And that speech was not unprotected "commercial speech."[10] The "core notion" of commercial speech is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (cleaned up); *see also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 637 (1985) ("Our commercial speech doctrine rests heavily on the common-sense distinction between speech proposing a commercial transaction and other

---

[10] Even if it was "commercial speech," that would not mean it was "unprotected" speech. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (recognizing that "commercial speech" is "accorded a measure of First Amendment protection," but that protection is more limited than the protection afforded to non-commercial speech).

varieties of speech." (cleaned up)). Here, Defendant Helm's speech did not propose a commercial transaction. Rather, Defendant Helm's speech consisted of commentary and criticism regarding Plaintiff Hales. As such, it was a "written or oral statement that is protected under applicable law," Fla. Stat. § 768.295(2)(a), and within the definition of "free speech in connection with a public issue," for purposes of Florida's anti-SLAPP statute.

Because Plaintiffs' claim against Defendant Helm is without merit and was filed primarily because he exercised the constitutional right of free speech in connection with a public issue, Plaintiffs should be required to reimburse Defendant Helm for his reasonable attorney fees and costs in defending against this lawsuit under Florida's anti-SLAPP statute.

### H. Defendant Teschendorf's Motion to Dismiss

In Count 13, Plaintiffs claim Defendant Teschendorf is liable for civil conspiracy. Defendant Teschendorf has moved to dismiss. (Doc. 127). Defendant Teschendorf, a non-Florida resident, asserts that dismissal is warranted under Rule 12(b)(2) for lack of personal jurisdiction. He has also sought dismissal for failure to state a claim

under Rule 12(b)(6). The Court will first address the jurisdictional argument and then move to the failure to state a claim argument. *See Rep. of Panama v. BCCI Holdings, S.A.*, 119 F.3d 935, 940 (11th Cir. 1997) ("As a general rule, courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims.").

**1. Personal Jurisdiction**

"A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). Under Florida's longarm statute, jurisdiction exists "over the nonresident defendant who commits a tort outside of the state that causes injury inside the state." *Id.*

Plaintiffs allege that Defendant Teschendorf operated a YouTube channel and made comments on that YouTube channel that caused harm to Plaintiffs in Florida. (Doc. 76 at 41-42). Those YouTube comments involved statements allegedly made by Defendant Teschendorf regarding Plaintiff Hales's conduct during litigation in a separate Florida lawsuit involving Hales and neighbors from Florida (i.e., Defendants Preston and

Cook). (*Id.* at 42). That is sufficient for personal jurisdiction under Florida's longarm statute. *See Licciardello*, 544 F.3d at 1283-84 (finding Florida's longarm statute reached the out-of-state creator of a website because the website was accessed in Florida and allegedly caused harm in Florida); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353-54 (11th Cir. 2013) (finding that Florida's longarm statute reached out-of-state website conduct because the website allegedly "cause[d] injury" in Florida).

Having found that the Florida's longarm statute confers jurisdiction over Defendant Teschendorf, it is necessary to address whether the Due Process Clause of the U.S. Constitution permits the exercise of jurisdiction. Under the Due Process Clause, jurisdiction may not be exercised over a nonresident defendant "unless his contact with the state is such that he has fair warning that he may be subject to suit there." *Licciardello*, 544 F.3d at 1284 (cleaned up). The "constitutional litmus test for personal jurisdiction is whether the defendant purposefully established minimum contacts in the forum State." *Id.* at 1285 (cleaned up). In intentional tort cases (like the current one), the

Eleventh Circuit has applied the "*Calder*[11] effects test" to determine whether there have been sufficient minimum contacts. *Id.* Under this test, "a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state." *Louis Vuitton Malletier*, 736 F.3d at 1356. The effects test is met when the tortious behavior is "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Licciardello*, 544 F.3d at 1286.

Here, the Court finds that Plaintiffs have satisfied the *Calder* effects test. Plaintiffs have alleged that Defendant Teschendorf's conduct was intentional. And they have alleged that Defendant Teschendorf's conduct was aimed at Florida. His YouTube channel was accessible in Florida, and he allegedly used his YouTube channel to make comments about Plaintiff Hales's actions in another Florida lawsuit and Plaintiff Hales's conduct in an ongoing saga involving a neighboring property owner in Florida. Under the circumstances at issue here, Defendant Teschendorf should have anticipated that any harm caused to Plaintiffs

---

11 *Calder v. Jones*, 465 U.S. 783 (1984).

would be suffered in Florida. Accordingly, Defendant Teschendorf had sufficient minimum contacts with the forum state to satisfy due process.

Finally, the Court must consider whether the exercise of personal jurisdiction over Defendant Teschendorf would comport with fair play and substantial justice. *Licciardello*, 544 F.3d at 1288. "Relevant factors include the burden on the defendant, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in resolving the dispute." *Id.* Defendant Teschendorf has not "offered any evidence of his finances or any other limitations on him to show that he would be burdened by having to litigate the case in Florida." *Louis Vuitton Malletier*, 736 F.3d at 1358. Moreover, the allegations in this case are highly Florida-centric, which provides Florida with a strong interest in hearing the case. Finally, Plaintiffs have an interest in having this case resolved in Florida. The Court, therefore, finds that exercising personal jurisdiction over Defendant Teschendorf would comport with fair play and substantial justice.

### 2. Failure to State a Claim

The Court will now turn to Defendant Teschendorf's argument that the civil conspiracy claim against him in Count 13 should be dismissed for failure to state a claim. With regard to that issue, the Court finds that the civil conspiracy claim against Defendant Teschendorf fails for the same reasons discussed above regarding Plaintiffs' civil conspiracy claim against Defendant Lee. Accordingly, Count 13 should be dismissed.[12]

## IV. Conclusion

For the reasons above, it is respectfully **RECOMMENDED** that:

1. Defendant Helm's Motion to Dismiss (Doc. 52) be **GRANTED** and the claims against Defendant Helm **DISMISSED with prejudice**[13] for failure to state a claim;

---

[12] Defendant Teschendorf also seeks reasonable attorney fees under Florida's anti-SLAPP statute. But Defendant Teschendorf is not entitled to such fees because he is proceeding *pro se*. *See Lee v. Animal Aid, Inc.*, 388 So. 3d 25, 31 (Fla. 4th DCA 2024) (stating that the defendant "as a pro se litigant" was "not entitled to attorney's fees" under the anti-SLAPP statute).

[13] There is no basis for providing Plaintiffs with another opportunity to amend. Plaintiffs were previously given an opportunity to amend after Defendant Helm filed a motion for more definite statement. (Docs. 16, 17). Plaintiffs are represented by counsel, and the Eleventh Circuit has "never required district courts to grant counseled plaintiffs more than

one opportunity to amend a deficient complaint . . . ." *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929-30 (11th Cir. 2016); *see also Henley v. Turner Broadcasting Sys., Inc.*, 267 F. Supp. 3d 1341, 1364 (N.D. Ga. 2017) (concluding that "it is unnecessary to allow Plaintiffs, who are represented by counsel, the opportunity to file a further amended complaint"). Here, Plaintiffs "already ha[ve] been given an opportunity to correct [their] pleadings," therefore, the Court is "not required to given [them] another chance." *Cornelius v. Bank of Am., NA*, 585 F. App'x 996, 1000 (11th Cir. 2014) (affirming dismissal with prejudice where the plaintiff had already been given an opportunity to amend).

Moreover, Plaintiffs have not moved for leave to amend in the manner required by Rule 15(a)(2). Instead, Plaintiffs have simply stated in their opposition responses that if the motions to dismiss are granted the Court should "afford Plaintiffs an opportunity to amend to address any perceived defect." (*See, e.g.*, Doc. 80 at 12). That is insufficient. *See Eiber Radiology*, 673 F. App'x at 930 (affirming dismissal with prejudice where the plaintiff had previously amended and opining that the plaintiff's statement at the end of response to motion to dismiss was insufficient to formally seek leave to amend under Rule 15(a)(2)); *see also Blackburn v. Shire US, Inc.*, No. 2:16-CV-963, 2017 WL 5013578, at *2 (N.D. Ala. Nov. 2, 2017) (dismissing with prejudice and stating that "[r]ather than requesting leave to amend his complaint a second time *before* the court ruled on this motion to dismiss, Plaintiff sat idly by as he awaited the district court's determination of Defendant's second motion to dismiss") (emphasis in original); *Chase v. Haskell Co.*, No. 1:22-CV-03941, 2023 WL 3763807, at *3 (N.D. Ga. June 1, 2023) (dismissing without leave to amend and explaining that the plaintiff failed to properly seek leave to amend because "[i]nstead of filing a motion, Plaintiff merely mentioned in his response to Defendant's motion to dismiss that if he has failed to state a claim" then he should be given leave to amend).

2. Defendant Hughes's Motion to Dismiss (Doc. 53) be **GRANTED** and the claims against Defendant Hughes **DISMISSED with prejudice** for failure to state a claim;

3. Defendant Matzkin's Motion to Dismiss (Doc. 55) be **GRANTED** and the claims against Defendant Matzkin **DISMISSED with prejudice** for failure to state a claim;

4. Defendant Cook's Motion to Dismiss (Doc. 61) be **GRANTED** and the claims against Defendant Cook **DISMISSED with prejudice** for failure to state a claim;

5. Defendant Lee's Motion to Dismiss (Doc. 106) be **GRANTED** and the claims against Defendant Lee **DISMISSED with prejudice** for failure to state a claim;

6. Defendant Bonebrake's Motion to Dismiss (Doc. 107) be **GRANTED** and the claims against Defendant Bonebrake **DISMISSED with prejudice** for failure to state a claim;

7. Defendant Keszey's Motion to Dismiss (Doc. 110) be **GRANTED** and the claims against Defendant Keszey **DISMISSED with prejudice** for failure to state a claim;

8. Defendant Teschendorf's Motion to Dismiss (Doc. 127) be **GRANTED** and the claims against Defendant Teschendorf **DISMISSED with prejudice** for failure to state a claim; and

9. This matter be recommitted to the undersigned for further proceedings involving Defendants Preston and Luthmann[14], as well as the determination of the reasonable attorney fees due to Defendant Helm under Florida's anti-SLAPP statute.

At Pensacola, Florida, this 10th day of February 2026.

/s/ Zachary C. Bolitho
Zachary C. Bolitho
United States Magistrate Judge

**Notice to the Parties**

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

[14] As stated previously, this case is stayed as to Defendant Preston because of her pending bankruptcy. With regard to Defendant Luthmann, the issues raised recently became ripe and remain under consideration by the undersigned.

**Exhibit 7** Judgment (Doc. 244 & 245)

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

Exh 7

JEREMY B. HALES,
Plaintiff,

vs. Case No.: 1:25cv58/RH/ZCB

RICHARD LUTHMANN, JR., et al.,
Defendants.
_______________________________/

## REPORT AND RECOMMENDATION

Currently before the Court is Defendant Luthmann's motion to dismiss. (Doc. 198). Plaintiff has responded in opposition. (Doc. 202). For the reasons below, the motion to dismiss should be granted.

### I. Background[1]

Plaintiff Jeremy Hales operates an online business that generates revenue by posting content on social media websites like YouTube, Facebook, and TikTok. Plaintiff has over 730,000 subscribers for his "What the Hale$" channel on YouTube and over 327,000 followers for his "What the Hale$" page on Facebook.

[1] The information below comes from the factual allegations in Plaintiff's third amended complaint. (Doc. 189). At this stage, those allegations are accepted as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Defendant Richard Luthmann also maintains an online presence by, among other things, posting content on a blog. In early 2025, Defendant Luthmann allegedly sent emails about Plaintiff to the Anti-Defamation League and to people who post content on YouTube. Around the same time, Defendant Luthmann also posted a video to a blog allegedly depicting Plaintiff "as Adolf Hitler by adding a Hitler mustache to Plaintiff's photograph and engaging in oral sex with a journalist." (Doc. 189 at 7).

In the third amended complaint, Plaintiff claims Defendant Luthmann's conduct violated Florida's sexual cyberharassment statute (count two). Plaintiff seeks money damages and injunctive relief against Luthmann.

## II. Discussion

Defendant Luthmann argues that dismissal is warranted for several reasons.[2] First, he argues that the Court lacks subject matter jurisdiction. Second, he argues that service of process has been

[2] Defendant Luthmann also raises arguments regarding joinder and severance. Because the Court concludes dismissal is warranted, it is unnecessary to address the joinder and severance arguments. If this matter is not ultimately dismissed, then Defendant Luthmann will be permitted to raise the joinder and severance issues by separate motion.

insufficient. Third, he argues that Plaintiff has failed to state a claim upon which relief can be granted. Because the order of operations requires jurisdiction to be addressed before merits, the Court will first address the subject matter jurisdiction argument. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (stating the general rule that a court "may not rule on the merits of a case without first determining that it has jurisdiction").

**A.**

According to Defendant Luthmann, the claim brought against him in the third amended complaint should be dismissed for lack of subject matter jurisdiction. Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, dismissal is warranted if the court lacks subject matter jurisdiction. Federal subject matter jurisdiction typically exists either because the case presents a federal question (28 U.S.C. § 1331) or the requirements of diversity jurisdiction have been met (28 U.S.C. § 1332).

Plaintiff's third amended complaint invokes the Court's diversity jurisdiction. (Doc. 189 at 2). Diversity jurisdiction exists when the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). It is undisputed that Defendant Luthmann and Plaintiff are diverse (Plaintiff is a citizen of Ohio, and

Defendant Luthmann is a citizen of Florida). But Defendant Luthmann contends that the amount in controversy does not exceed $75,000.

When a plaintiff has filed an action in federal court based on diversity jurisdiction, "the sum claimed by the plaintiff controls" for amount in controversy purposes "if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 276 (1977) (cleaned up).

Here, the third amended complaint alleges that Plaintiff Hales suffered $370,000 in damages from the alleged sexual cyberharassment by Defendant Luthmann. (Doc. 189 at 14). According to the third amended complaint, these damages stemmed from reputational harm, harassment, and loss of business opportunities. (*Id.* at 13-15). Taking as true the allegations about Plaintiff's online subscriber base and his associated online business ventures that were allegedly damaged by Defendant Luthmann's conduct, the Court finds that Plaintiff has alleged in good faith damages that satisfy the amount in controversy requirement. And it does not appear to a legal certainty that the claim is really for less than the jurisdictional amount. Accordingly, the Court has subject matter jurisdiction over this case based on diversity of

citizenship under 28 U.S.C. § 1332. *See Pete v. Cooper*, 812 F. Supp. 3d 1251, 1256-58, 1269-70 (S.D. Fla. 2025) (stating that a complaint alleging damages exceeding $75,000 from defendant's "campaign of smear and harassment through social media . . . using video, audio, and written posts to cause reputational harm and emotional distress" including a "deepfake pornographic video" of plaintiff was sufficient for diversity jurisdiction).

**B.**

Next, the Court will address Defendant Luthmann's argument that dismissal is warranted under Rule 12(b)(5) for insufficient service. The Court rejects Defendant Luthmann's argument for two reasons. First, Defendant Luthmann has been evading service and has had actual notice of this lawsuit for quite some time. (*See, e.g.*, Doc. 158 at 5-14; Doc. 115). Second, Plaintiff has satisfied the requirements for substituted service.

It appears to the Court that Defendant Luthmann has treated service like a game of cat and mouse. He has actively worked to evade service, all the while being fully aware of the lawsuit and filing lots of documents in the lawsuit. As such, the Court finds that Plaintiff's service attempts on Defendant Luthmann are "sufficient to confer jurisdiction." *See Lancaster v. Bottle Club, LLC*, No. 8:17-cv-634, 2017 WL 4922855, at

*2 (M.D. Fla. Oct. 31, 2017) (finding service sufficient where plaintiffs made multiple attempts to serve defendants who had notice of the lawsuit but were foiled by defendant's refusal to answer the door or accept any service documents); *see also Banco Latino, S.A.C.A. v. Gomez Lopez*, 53 F. Supp. 2d 1273, 1281 (S.D. Fla. 1999) ("Notice of a complaint coupled with good faith attempted service is sufficient to confer jurisdiction where a party is evading service of process."). Indeed, at this point "it seems futile to require Plaintiff[] to expend countless additional resources in order to effect service upon" Defendant Luthmann. *Chamberlain v. Integraclick, Inc.*, No. 4:10cv477-SPM, 2011 WL 1456878, at *4 (N.D. Fla. Apr. 15, 2011) (finding the defendant was served where there was actual notice, multiple attempts to serve, and acts to evade service).

The Court also, and alternatively, finds that Defendant Luthmann has been served under Florida's substituted service procedure. Although the general rule under Florida law is that a defendant must be personally served, "the general rule has exceptions, such as substituted service on the Secretary of State" under Fla. Stat. § 48.161. *Rebalko v. Atallah*, 413 So. 3d 170, 172 (Fla. 4th DCA 2025). Under § 48.161, a plaintiff may complete substituted service by serving the Florida Secretary of State

when an individual conceals his whereabouts. To complete substituted service under § 48.161, a plaintiff must (1) serve the Secretary of State with a copy of the summons and complaint; (2) pay the requisite fee to the Secretary of State; (3) provide notice of service upon the Secretary of State to the defendant by registered or certified mail;[3] and (4) file an affidavit of compliance that shows substituted service was proper and that due diligence was exercised in attempting to complete personal service before using substituted service. *Fundamental Nutrition LLC v. Emerge Nutraceuticals Inc.*, No. 5:23cv64, 2023 WL 6975984, at *3 (M.D. Fla. Oct. 23, 2023).

Here, the Court finds that the requirements of substituted service have been satisfied. More specifically, the Court finds that Defendant Luthmann has concealed his whereabouts and worked to actively evade service. As detailed by Plaintiff, repeated attempts to locate and serve Defendant Luthmann have been unsuccessful. (Docs. 150, 150-1, 150-2). Defendant Luthmann is very much aware of the lawsuit, he is aware of the attempts to serve him, and he has taken steps to avoid being served.

[3] "Courts may dispense with the filing of a postal receipt if a substituted service statute is invoked on the ground that the defendant is evading service." *Wise v. Warner*, 932 So. 2d 591, 593 (Fla. 5th DCA 2006).

Second, the Court finds that Plaintiff has served the Florida Secretary of State and otherwise complied with the procedural requirements for substituted service. (*See* Docs. 150, 150-1).

The Court further finds that Plaintiff exercised due diligence in attempting to locate and serve Defendant Luthmann, as evidenced by the process server affidavits and related documents provided by Plaintiff. (Doc. 150-2). In reaching that conclusion, the Court notes that the "test is not whether it was in fact possible to effect personal service in a given case, but whether the plaintiff reasonably employed knowledge at [his] command, made diligent inquiry, and exerted an honest and conscientious effort appropriate to the circumstances, to acquire information necessary to enable [him] to effect personal service on the defendant." *Verizon Trademark Servs., LLC v. Producers, Inc.*, No. 8:10-cv-665, 2011 WL 3296812, at *3 (M.D. Fla. Aug. 2, 2011). Accordingly, the Court concludes that Defendant Luthmann has been served by substituted service under Fla. Stat. § 48.161.

Defendant Luthmann attempts to avoid this conclusion by arguing that substituted service is only available for nonresidents, and he is a resident of Florida. The Court disagrees with Defendant Luthmann's argument. The statute provides that substituted service may be used

when "an individual or a business entity is a nonresident *or* conceals his, her, or its whereabouts . . . ." Fla. Stat. § 48.161(2) (emphasis added). The word "'or' is generally construed in the disjunctive when used in a statute or rule." *Sparkman v. McClure*, 498 So. 2d 892, 895 (Fla. 1986). "The use of a disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately." *Ellinwood v. Bd. of Architecture & Interior Design*, 835 So. 2d 1269, 1270 (Fla. 1st DCA 2003). Applying that principle here, Fla. Stat. § 48.161(2) provides two alternatives for when substituted service may be used—(1) the individual or business entity is a nonresident; or (2) the individual or business entity is concealing its whereabouts. So regardless of Defendant Luthmann's status as a Florida resident, he is subject to substituted service because he has concealed his whereabouts and evaded service. *See Smith v. Leaman*, 826 So. 2d 1077, 1078 (Fla. 2d DCA 2002) (stating that § 48.161 "allows for substituted service of process on a Florida resident who is concealing his whereabouts"). The Court, therefore, rejects Defendant Luthmann's argument that dismissal is warranted for lack of service.

## C.

The Court will now turn to Defendant Luthmann's argument that dismissal is warranted under Rule 12(b)(6) for failure to state a claim.

To overcome a motion to dismiss for failure to state a claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the motion to dismiss stage, the complaint's factual allegations are accepted as true, but its legal conclusions are not. *Id.*

In count two, the third amended complaint alleges that Defendant Luthmann violated Florida's sexual cyberharassment statute, Fla. Stat. § 784.049. Plaintiff claims Defendant Luthmann did this by publishing on a blog a video that allegedly depicted Plaintiff engaged in a sex act.[4] In his motion to dismiss, Defendant Luthmann argues that Plaintiff's allegations are insufficient to state a claim under Fla. Stat. § 784.049. As explained below, Defendant Luthmann is correct.

---

4 The third amended complaint includes a link to the video, and the video is discussed throughout the third amended complaint. (Doc. 189 at 7, 11). Because Plaintiff "refers to [the video] in the complaint," the video is "central to the [cyberharassment] claim," and the video's "contents are undisputed[,]" the Court will consider the video in connection with the motion to dismiss. *Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1276 (11th Cir. 2023); *see also Quinette v. Reed*, 805 F. App'x 696, 700 (11th Cir. 2020) (considering, at the motion to dismiss stage, video footage that was referenced in the complaint).

Section 784.049 "criminalizes sexual cyberharassment." *Conradis v. Buonocore*, No. 6:18-cv-1486, 2021 WL 4243720, at *5 (M.D. Fla. Sept. 17, 2021) (cleaned up). The statute was designed to address so-called "revenge porn," which occurs when a "person depicted in a sexually explicit image taken with the person's consent" has the image published online without the person's consent. *See* Fla. Stat. § 784.049(1)(a)-(b) (discussing the legislature's findings relating to the sexual cyberharassment statute); *see also Crapps v. State of Fla.*, 180 So. 3d 1125, 1127 (Fla. 1st DCA 2015) (explaining that the sexual cyberharassment statute was enacted to provide a tool for addressing "acts of so-called 'revenge porn'"). In addition to criminal penalties, the statute provides an "aggrieved person" with the right to bring a civil action "against a person" who has violated the statute. Fla. Stat. § 784.049(5) (Oct. 1, 2022).[5]

[5] The statute was amended, effective October 1, 2025. But Defendant Luthmann's video was published in January of 2025, so the Court looks to the version of Fla. Stat. § 784.049 that was effective at that time, which was the October 1, 2022, version. *See S-Fer Int'l, Inc. v. Stonesheets, LLC*, No. 14-24662-CIV, 2016 WL 8808748, at *4 (S.D. Fla. Jan. 19, 2016) ("Florida law provides that the applicable version of a statute is that which was in effect when a cause of action accrues."). To the extent that any of the statutes that Fla. Stat. § 784.049 points to for definitional purposes were subsequently amended, the Court applies those statutes as they existed in January of 2025. And for what it is worth, none of the

To state a violation of § 784.049, a plaintiff must plausibly allege that:

1. Defendant published a sexually explicit image of Plaintiff on an internet website;
2. The image contained or conveyed Plaintiff's personal identification information;
3. Defendant acted willfully and maliciously, for no legitimate purpose, and with the intent of causing substantial emotional distress to Plaintiff;
4. Plaintiff did not consent to the publication.

*In re Standard Jury Instructions in Criminal Cases-Report 2017-09*, 238 So. 3d 192, 196 (Fla. 2018). Looking to the third amended complaint, it plausibly alleges that Defendant Luthmann posted an image of Plaintiff on an internet website, that the image conveyed Plaintiff's name (which qualifies as personal identification information under the statute, *see* Fla. Stat. 784.049(2)(b)), that Defendant Luthmann acted with the requisite mental state, and that Plaintiff did not consent to the publication. The question is whether Plaintiff has plausibly alleged that the image

changes made to § 748.049 in 2025 would have changed the result in this case.

Defendant Luthmann posted was "sexually explicit." To answer that question, it is necessary to venture through a dense forest of defined terms.

The venture starts with the phrase "sexually explicit image," which the statute defines as any photograph or video that depicts "nudity" or depicts "any person engaging in sexual conduct." *In re Standard Jury Instructions*, 238 So. 3d at 196; Fla. Stat. § 784.049(2)(a), (d) (Oct. 1, 2022). Let's take those terms one at a time—starting with what "nudity" means in this context. According to the statute (i.e., § 748.049(d)) "nudity" has the same meaning here as it does in Fla. Stat. § 847.001. And that statute defines "nudity" as:

> the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering; or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple; or the depiction of covered male genitals in a discernibly turgid state.

Fla. Stat. § 847.001(11) (Oct. 1, 2022).

Having established what "nudity" is for purposes of § 748.049(d), it is necessary to decide if the third amended complaint plausibly alleges that the video posted by Defendant Luthmann depicts "nudity" by Plaintiff. It does not. Instead, the video shows Plaintiff's face

superimposed on somebody else's body. The video only shows the body from the shoulders up, and the body is clothed. Thus, the third amended complaint does not plausibly allege that the video is "sexually explicit" based on a depiction of "nudity" by Plaintiff.

An image can also be "sexually explicit" if it depicts a person engaged in "sexual conduct." According to the statute, "sexual conduct" means the same thing in § 748.049(d) as it does in § 847.001(19). Here is the definition from § 847.001(19):

> actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed.

Fla. Stat. § 847.001(19) (Oct. 1, 2022). As you just read, "sexual conduct" includes "actual or simulated . . . deviate sexual intercourse."[6] But what does that mean? To find out, we turn to Fla. Stat. § 847.001(5), which

---

[6] Plaintiff has simply stated that the video depicts "sexual conduct" (Doc. 202 at 15), but he has not identified what particular portion of the definition of "sexual conduct" he believes is implicated. The only portion that the Court believes could arguably be implicated by the video is "deviate sexual intercourse." Thus, that is where the Court will focus its discussion.

says that "deviate sexual intercourse" is "sexual conduct between persons not married to each other consisting of contact between the penis and the anus, the mouth and the penis, or the mouth and the vulva." Fla. Stat. § 847.001(5) (Oct. 1, 2022). The statute not only covers the "actual" depiction of these things, but also the "simulated" depiction of them. And in this context, "simulated" means "the explicit depiction of conduct described in subsection (19) which creates the appearance of such conduct and which exhibits any uncovered portion of the breasts, genitals or buttocks." Fla. Stat. § 847.001(22) (Oct. 1, 2022).

Applying all that here, the third amended complaint does not plausibly allege that the video posted by Defendant Luthmann depicted a person engaged in "sexual conduct." The video shows an image of Plaintiff Hales's face—with an added fake Hitler mustache—superimposed on another person's body. The video also shows an image of a woman with her mouth open. The image of the woman then rotates before moving to the bottom of the screen such that only a portion of the woman's hair is visible. The woman's head then appears to go up and down, as the image of Plaintiff Hales bears an expression of excitement or shock. Although the video is intended to mockingly suggest that Plaintiff Hales is receiving oral sex from the woman, the video does not

show "contact between the penis and the anus, the mouth and the penis, or the mouth and the vulva." Fla. Stat. § 847.001(5) (Oct. 1, 2022). Indeed, the video shows neither male nor female genitalia. The video, therefore, does not depict "actual" "deviate sexual intercourse."

The video also does not depict "simulated" "deviate sexual intercourse." As mentioned above, the statutory definition of "simulated" requires two things: "[1] the explicit depiction of [sexual conduct] . . . which creates the appearance of such conduct *and* [2] which exhibits any uncovered portion of the breasts, genitals, or buttocks." Fla. Stat. § 847.001(22) (Oct. 1, 2022) (emphasis added). The Court assumes *arguendo* that the video creates "the appearance" of "contact between . . . the mouth and the penis" as necessary to meet the first statutory requirement for conduct to qualify as "simulated." But the second statutory requirement[7] is clearly not satisfied because the video does not

---

[7] The statute uses the word "and," which is a conjunctive that "combines items." Hon. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012). When a statute lists requirements "connected by the conjunctive 'and,'" it is necessary to meet all the requirements. *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021); *see also Galleon Bay Corp. v. Bd. of Cnty. Comm'rs of Monroe Cnty.*, 105 So. 3d 555, 567 (Fla. 3d DCA 2012) ("Of course, 'and' is a conjunction to mean that both elements must be met." (cleaned up)). Although there are rare cases where "and" is not used in the conjunctive sense, this case is not one of them. Reading the "and" in this statute as

"exhibit[] any uncovered portion of the breasts, genitals, or buttocks." *Id.* The video, therefore, does not depict any "simulated" "sexual conduct" as those terms are defined by Fla. Stat. §§ 847.001(19), (22).[8]

When all the above is put together, it leads to the conclusion that Plaintiff has not plausibly alleged that the video published by Defendant Luthmann contained a "sexually explicit image" of Plaintiff. As a result, Plaintiff has not stated a plausible claim under Florida's sexual cyberharassment statute, Fla. Stat. § 784.049. Although the video Defendant Luthmann published is vulgar, offensive, and juvenile, it does not constitute sexual cyberharassment under Florida law. Thus, dismissal is warranted for failure to state a claim.[9]

---

anything other than a conjunctive would make little sense given the statutory text and context.

[8] This result is consistent with the idea that statutes prohibiting the depiction of "simulated" sexual conduct are typically intended to address situations where "[t]he portrayal" would "cause a reasonable viewer to believe that the actors actually engaged in" the depicted conduct. *United States v. Williams*, 553 U.S. 285, 297 (2008) (discussing simulated sexual conduct in the context of child pornography laws). Here, the video—containing superimposed faces and clearly satirical elements—would not lead any reasonable viewer to believe that Plaintiff and the woman were actually engaging in sexual conduct in the video.

[9] The dismissal should be with prejudice because Plaintiff has had multiple chances to amend his complaint. *See Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 930 (11th Cir. 2016) ("We have never required district courts to grant counseled plaintiffs more than one opportunity to amend a deficient complaint, nor have we

## III. Conclusion

For the reasons above, it is respectfully **RECOMMENDED** that:

1. Defendant Luthmann's motion to dismiss (Doc. 198) be **GRANTED** and count two of the third amended complaint (Doc. 189) be **DISMISSED with prejudice** for failure to state a claim.

2. This matter be recommitted to the undersigned for further proceedings involving Defendant Preston.

At Pensacola, Florida, this 2nd day of September 2026.

/s/ Zachary C. Bolitho
Zachary C. Bolitho
United States Magistrate Judge

## Notice to the Parties

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained

---

concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has failed to cure a deficient pleading after having been offered ample opportunity to do so."). To the extent that Defendant Luthmann (a *pro se* litigant) believes that he is entitled to attorney's fees under Florida's Anti-SLAPP statute (*see* Doc. 198 at 12-13), he is wrong. *See Lee v. Animal Aid, Inc.*, 388 So. 3d 25, 31 (Fla. 4th DCA 2024) (stating that the appellant "as a pro se litigant on her Anti-SLAPP motion, was not entitled to attorney's fees").

in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

EXH 7

**JEREMY B. HALES,**

***Plaintiff,***

**v.** **Case No.: 1:25cv58-RH-ZCB**

**RICHARD LUTHMANN, JR. et al.,**

***Defendants.***

______________________________/

**JUDGMENT**

This judgment is entered under Federal Rule of Civil Procedure54(b). It is adjudged that the plaintiff Jeremy B. Hales's claim against the defendant Richard Luthmann, Jr. is dismissed on the merits with prejudice for failure to state a claim on which relief can be granted.

JESSICA J. LYUBLANOVITS
CLERK OF COURT

October 5, 2026
Date

s/A. Tinaya-Miller
Deputy Clerk: A. Tinaya-Miller

16?

**Exhibit 8** Owen Order (Doc. ~~15~~)

EX H
8

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA GAINESVILLE DIVISION**

**JEREMY BRYAN HALES and MARTHA RIZK,**

**Plaintiff,**

**v.** **Case No. 1:25-cv-290-AW-HTC**

**DANIEL REX OWEN,**

**Defendant.**

______________________________/

**JUDGMENT**

Plaintiffs' claims are dismissed on the merits for failure to state a claim.

JESSICA J. LYUBLANOVITS
CLERK OF COURT

December 19, 2025
Date

s/ Pam Lourcey
Deputy Clerk: Pam Lourcey

**Exhibit 9** Summit County, Ohio Order

Ex H

9

TAVIA GALONSKI

2026 SEP 15 AM 9: 13

SUMMIT COUNTY
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
COUNTY OF SUMMIT

| | | |
|---|---|---|
| JEREMY HALES<br>Plaintiff<br>-vs-<br>JOHN COOK<br>Defendant | ) | CASE NO. CV-2023-09-3594<br>JUDGE SUSAN BAKER ROSS<br>MAGISTRATE KANDI S. O'CONNOR<br>**ORDER** |
| JEREMY HALES<br>Plaintiff<br>-vs-<br>LYNETTE PRESTON<br>Defendant | ) | CASE NO. CV-2023-09-3595<br>JUDGE KATHRYN MICHAEL<br>MAGISTRATE KANDI S. O'CONNOR<br>**ORDER** |
| JEREMY HALES<br>Plaintiff<br>-vs-<br>JOHN COOK<br>Defendant | ) | CASE NO. CV-2025-10-4860<br>JUDGE ALISON McCARTY<br>MAGISTRATE KANDI S. O'CONNOR<br>**ORDER** |
| JEREMY HALES<br>Plaintiff<br>-vs-<br>LYNETTE PRESTON<br>Defendant | ) | CASE NO. CV-2025-10-4859<br>JUDGE JOY MALEK OLDFIELD<br>MAGISTRATE KANDI S. O'CONNOR<br>**ORDER** |

There are currently four cases pending in the Summit County Court of Common Pleas that involve Petitioner Jeremy Hales and Respondents Lynette Preston and John Cook. The cases are as follows:

CV 2023-09-3594 Jeremy Hales v. John Cook (Judge Baker Ross)

CV 2025-10-4860 Jeremy Hales v. John Cook (Judge McCarty)

CV 2023-09-3595 Jeremy Hales v. Lynette Preston (Judge Michael)

CV 2025-10-4859 Jeremy Hales v. Lynette Preston (Judge Malek Oldfield)

The procedural history of these cases is long, intertwined and somewhat tortured and therefore requires a thorough explanation.

Hales is seeking a continuance or renewal of protection orders against Preston and Cook, alleging that they continued a campaign of harassment both individually and through third parties on social media despite protection orders issued in 2023.

Beginning on September 25, 2023 in cases CV 2023-09-3594 and CV 2023-09-3595, Jeremy Hales (Hales) filed a request for a civil stalking protection order against John Cook (Cook) and Lynette Preston (Preston). Hales is a resident of Summit County, Ohio, but also owns property in Otter Creek, Florida. Cook and Preston are neighbors of Hales in Florida. Subsequently full orders were issued on November 1, 2023 for a period of two years, through October 10, 2025 (Original Petitions). On September 26, 2025, Hales filed a motion to extend the Original Petitions and a fourth Motion for Contempt[1]. On October 7, 2025, with the Motion to Extend the Original Petitions and fourth Motion for Contempt pending, Hales filed two new Petitions under cases CV 2025-10-4860 and CV 2025-10-4859 (Second Petitions).

As noted by the Court in the order dated October 10, 2025, this Court held an ex parte hearing on both the Original Petitions, Motion to Extend and the Second Petitions on October 9, 2025. Based on the testimony and evidence introduced at that ex parte hearing, the Court granted the ex parte extension of the Original Petitions until a full hearing was held on the Motion to Renew.

[1] Two motions for contempt were granted, the third motion was denied. The fourth motion is addressed herein.

The Court held one hearing on all of the pending issues - the Motion to Renew, the Motion for Contempt on the Original Petition and the Second Petitions. Before proceeding to ruling on the pending motions, the court will address the procedural consideration of consolidation.

These four cases all contain a common issue of law or fact. Hales is the Petitioner in all of the cases and Cook and Preston are the Respondents. The testimony and issues are intertwined with Cook and Preston and at the full hearing held on March 6, 2026 all parties and counsel agreed to proceed with one omnibus hearing on all issues and with all parties. Accordingly, the court finds that the consolidation of these matters into one case will avoid unnecessary cost or delay. Pursuant to Civ.R. 42(A), a court possesses the discretionary power to sua sponte consolidate actions involving a common question of law or fact. Yazdani-Isfehani v. Yazdani-Isfehani, 2006-Ohio-7105.

Therefore, the Court orders that cases CV 2025-10-4860, CV 2023-09-3595 and CV 2025-10-4859 are all consolidated into the lowest case number, CV 2023-09-3594 pending before Judge Baker Ross.

The Court will next address whether this matter is considered to be a Motion to Extend the Original Petitions or a new petition under the Second Petitions.

R.C. 2903.214(E)(2)(b) provides: Any protection order issued pursuant to this section may be renewed in the same manner as the original order was issued. The Court treats a motion to extend with the same procedural requirements needed for issuing an original civil protection order. Martin v. Martin, 2013 Ohio 5703. The statute does not explicitly set forth when a renewal is permitted, but use of the term "renew" suggests the issuance of an additional civil protection order after the expiration of an original order. Id. The Martin court further explained, using the dictionary definition from *Black's Law Dictionary* 1410 (9th Ed.2009), "defining "renewal" as "[t]he act of restoring or reestablishing" or "[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract".

In this matter and based on the consolidation of the Original Petitions and the Second Petitions, this Court will apply the same standard to both the Motion to Extend the Original

This Court will apply the same standard to both the Motion to Extend the Original Petitions as well as the Second Petitions, due to the consolidation of the Original and Second Petitions. Regardless of the vehicle that has put these issues before the Court, the standard of review remains the same.

On March 6, 2026, a full evidentiary hearing was held. At the hearing, all parties and counsel agreed that the four cases would be heard together, including the pending Motion for Contempt. Attorney Eli Heller was present for Hales, while Attorney Justin Weatherly was present representing Cook and Preston.

Hales testified and called the following witnesses in support of his petitions: Shara Wolf, Martha Rizk, Corporal McIntyre and Chief Beauchamp from the Levy County Sheriff's Office.

Testimony of Jeremy Hales:

1. Hales testified that he is a YouTuber and that he lives his life largely online, that he documents everything he does to create a video blog, people follow the blog and that is part of how Hales makes his income.
2. When asked whether Hales continued to post about Preston and Cook for content purposes for his online followers, Hales denied this accusation. Hales noted that Preston and Cook have built an entire network called "the anti what the Hales ecosystem" whose main purpose is to destroy Hales YouTube empire. Hales testified that he continues to post content online as a safety measure and that he has a camera with him wherever he goes.
3. Hales testified that Preston and Cook are at the center of the "Hales ecosystem" along with Matzkin, an attorney who works with Preston and Cook, and that this ecosystem uses social media to incite others to threaten harm to Hales.
4. Hales identified Exhibit D as an undated social media post allegedly made by Preston on the Facebook site, Otter Creek Standing in the Truth, which states: "… if you watch Two Lees in a Pod on You Tube you can see both sides and see the truth."
5. Hales identified Exhibit E as a social media post allegedly made by Preston on the Facebook site, Otter Creek Standing in the Truth, in December of 2025, which states: "I will stand on my innocence until the day I die. I have done nothing that was charged with nothing not one thing and I have proof."
6. Hales identified Exhibit F as a social media post allegedly made by Preston on the Facebook site, Otter Creek Standing in the Truth, on November 11, 2025, which states: "Slay the narcissist". Hales testified that he believes this message is a direct death threat in trying to incite others to harm him. Hales testified that he fears for his life "every day".

7. Hales identified Exhibit G as a social media post allegedly made by Preston on the Facebook site, Otter Creek Standing in the Truth, in November 2025. The post shown in Exhibit G denies being part of any ecosystem and denies having had contact with several named individuals.
8. Hales identified Exhibit H as the podcast, Two Lees in a Pod and further identified the speaker as Lisa Lee. In the broadcast, Lee states that she is Preston's public relations team.
9. Hales identified Exhibit I as a screen sheet of an individual called Legally Leslie. In the screenshot, the poster states "stop bullying and reject Jeremy Hales online."
10. Hales identified Exhibit J as a post but does not identify who made the post or the date of the post saying "Save *** Grace".
11. Hales alleges that Lisa Lee, creator of the Two Lees in a Pod podcast, along with Bruce Matzkin are recruiting paid harassers and agitators, including disbarred attorneys to harass, threaten and intimidate Hales. Hales testified that Cook has provided footage from his security cameras to Two Lees in a Pod. Hales alleged that Two Lees in a Pod set up a Go Fund Me site to raise funds for Preston and Cook.
12. Hales identified Exhibit K as an image taken on December 14, 2024 from a security camera posted on Cook and Preston's property. The camera is attached to a fence on the Preston/Cook property that captures images of Hales' vehicle as he comes and goes from his Florida property. Hales alleges that Preston/Cook have provided the images to Two Lees in a Pod and that those images have been broadcast that show his whereabouts.
13. Hales identified Exhibit L as an image taken on December 16, 2024. Hales identified this image of Hales driving down the public road from the camera located on the Preston/Cook property. Hales testified that the fact that every time he leaves his property is posted online causes him to fear for his life.
14. Hales identified Exhibit I as a photograph taken on December 7, 2025. Hales identified this image as being taken from the security camera located on the Preston/Cook property. Hales alleges that as soon as he arrived back in Florida after having been in Ohio for a December 2025 hearing, that Two Lees in a Pod broadcast the image from the security camera regarding Hales' location. Hales testified that he believed this action was a violation of the civil stalking protection order as Preston and/or Cook were broadcasting his whereabouts to incite others to cause his harm. Hales testified that the broadcasting of the surveillance footage in real time leads him to fear for his safety.
15. Hales identified Michael Volpe as another member of the "anti What the Hales ecosystem" as a self-proclaimed journalist, harasser and agitator. Hales testified that he has witnessed Preston and Cook directly participating in broadcasts with Volpe.
16. Hales identified Exhibit N as a video posted by Volpe on November 29, 2025. In the video, Hales identified a page from the civil stalking protection order issued by this court as well as Preston and Cook, who appeared in the video.

17. Hales identified Exhibit O as an article entitled "Ohio's attorney unethical cowardice causes heartache and POLAMOP in Hales case." The date of posting was not identified. Hales testified that POLAMOP is an acronym that the anti What the Hales group created that relates to protraction of litigation. Hales testified that articles such as Exhibit O incite others to cause harm to him. Hales further testified that there are direct connections between Preston and/or Cook with the members of the "ecosystem" and that contact encourages the online posting and broadcasting that is done on behalf of Preston and Cook to the detriment of Hales.
18. Hales identified Exhibit P as a video from January 2025 of Hales driving down the road filming. Hales testified that whenever he leaves his property, he films for his safety. Hales testified that the video shows Cook, on his own property, taking his two hands, placing them behind his back, and then giving Hales the middle finger.
19. Hales identified Exhibit Q as a photograph of a sign posted on the Preston/Cook property that says "OCC". Hales testified that he believes this sign relates to a Facebook page called the "Otter Creek Creep" that was made by Cook. Hales testified that it was his belief that the posting of the OCC sign was a direct attempt by Cook to communicate with Hales.
20. Hales identified Richard Luthman as a disbarred lawyer that is a paid harasser and agitator. Luthman has appeared on the Two Lees is a Pod podcast as well as on Michael Volpe's blog.
21. Hales identified Exhibit R as a message sent to him by Luthman in February of 2025. The message states: "So you're saying the federal bureau of prisons didn't rehabilitate me? Good. Maybe it's because the charges against me are BS lawfare. My response to you is that I have something to project into your eye socket. I'll be yelling that at Jeremy Hales very shortly when my film crew is in Otter Creek." Hales testified that he took this as a threat and that Luthman was threatening to kill him on behalf of Preston and Cook.
22. Hales identified Exhibit S as a video from January 7, 2025. In the video, Luthman is in the forefront of the video and in the back appears to be an AI generated image of Hales in a coffin. In the video, Luthman says multiple times that Hales is dead. Hales believes this is a death threat from Luthman.
23. Hales identified Exhibit T as a screenshot dated December 21, 2025. In the image, an individual named John Cook leaves a public message under a video with Luthman and Volpe that allegedly harassed Hales.
24. Hales identified Exhibit U as a message from Luthman published online in which Luthman mentions Hales and then states "they should sleep with Glocks under their pillows." Hales considered this to be a direct death threat from Luthman.
25. Hales testified that he has a three terabyte hard drive with "everything" on it and that we would be in court for over a week if he had to present all the evidence he has collected.
26. Hales testified that there was an interaction with Cook about a week before the subject hearing. Hales testified that he pulled into a hardware store and saw Cook's vehicle.

Hales testified that he had his camera rolling "for his safety", but no video of the incident was introduced in court. Hales testified that he waited outside for Cook to leave the store, and that when Cook left the store he "showed" Hales his firearm, which Hales noted Cook was legally able to open carry in Florida. Hales admitted that Cook did not brandish the firearm, but that it was present for Hales to see.

27. On cross-examination, Hales reiterated that he is not pursuing this civil stalking protection order as a way of generating content for his YouTube channel.
28. On cross-examination, Hales testified that Preston and Cook were violating the protection order by cooperating and colluding with Two Lees in a Pod, Luthman and Volpe.
29. Hales testified that it was his belief that money controls people, that the money being donated on behalf of Preston and Cook is being used to pay people like Volpe to harass and agitate. When asked what evidence Hales had to support this allegation, Hales noted that the evidence would be revealed in other court cases in the federal court system.
30. As to Exhibit F, the Facebook post on Otter Creek Standing in the Truth that says "Slay the narcissist," Hales admitted that neither his name nor his photo is mentioned in the post. Hales testified that Preston uses the term "the narcissist" as a nickname for him.
31. Hales identified Exhibit 3 as a video taken by Hales that was the subject of a previous contempt motion. The video shows Cook walking down a public road while Hales is in his vehicle on the road. Hales yells at Cook that he is closer than 10 feet to Hales, to which Cook responds to Hales to "suck his cock." Hales clarified that Cook was previously held in contempt, not for failing to move out of the public road, but for yelling an obscenity directed at Hales.
32. Hales again testified that there was so much evidence against Preston and Cook that if he tried to show all the evidence "we would never leave this courtroom there is so much."
33. Hales testified that the social media postings by Luthman, Volpe, Two Lees in a Pod and any other social media personalities were done under the direction of Preston and Cook. Hales then testified that Preston and Cook were suing Two Lees in a Pod for making money off Preston and Cook and/or scamming Preston and Cook out of money. Hales could not offer justification for this juxtaposition, which contradicts his characterization of the relationship between Two Lees in a Pod, Preston and Cook.

Testimony of Shara Wolf:

Wolf testified that she is an investigative journalist and that she was initially contacted by Preston in 2023 to conduct investigations into the issues between Hales, Preston and Cook. Wolf explained that she was introduced to Lisa Lee from Two Lees in a Pod by Bruce Matzkin, an attorney working with Preston and Cook. Wolf testified that Lee posts about Hales "for hours and hours every day." Wolf testified that she was added to a group chat that included Preston

and Lee, and that Preston would give information to Lee as the content for the podcast. Wolf testified that Cook actively commented and participated in the Two Lees in a Pod podcast.

34. Wolf identified a recording she made with Preston on August 21, 2023, marked as Exhibit A. After the audio was played, Wolf confirmed that in the audio recording, Preston said that Hales needed to be put down like a dead dog.
35. Wolf identified Exhibit B as a screenshot of a Facebook message dated August 23, 2023 from Cook. The image is described as a message from Cook that says "If *** wasn't around I would have shot him in the face and already fed him to an alligator." Wolf testified that the name covered with a teddy bear emoji in the screenshot is Preston's minor child and that the "him" in the post refers to Hales.
36. Wolf testified that Matzkin also participated in the group conversations with Lee for the podcast to provide content.
37. Wolf testified that in one conversation, undated, that Preston and Cook were searching for a hit man to kill Hales. Wolf testified that she contacted the Levy County Sheriff after the hit man conversation, but that no action was taken. It was after this point that Wolf, instead of contacting Hales, published the information on the internet.
38. Wolf testified that she has continued to work and monitor this case over the past three years and that in her opinion the online content directed at Hales has gotten much worse and is "very concerning".
39. Wolf detailed that online content includes name calling of Hales, including "germ", "Charles Manson" and calling him a cult leader.
40. Wolf identified Exhibit C as a screen shot of a message she received from Bruce Matzkin dated August 3, 2024. The message reads "... I need her, I need you, she needs both of us whether she admits it or not. We have a goal. We can either get hung up on these things that don't advance it or we can stay focused. Destroy Jeremy Hales legally, that is the goal, that our client his victim is so difficult is unfortunate, but it doesn't change the goal. I want to destroy this man and his You Tube empire."
41. Wolf also identified other individuals involved in the Hales ecosystem, Richard Luthman, a journalist that works with Matzkin and Michael Volpe, an internet broadcaster. Wolf stated that "these people are all discussing vigilante justice against him and using guns and it's getting quite alarming to me."
42. On cross-examination, Wolf identified Exhibit 1 as an email she sent to Matzkin on June 2, 2024. The email is a written document of what Wolf learned through her investigation regarding Hales, Preston and Cook. Wolf stated at the hearing that she did not do the synopsis of her own accord, but that she was forced and/or coerced by Matzkin to write the document. Upon further questioning, Wolf admitted that she was capable of her own volition to choose to write or not to write the document. The email then summarizes interactions between Hales, Preston and Cook.

43. On cross-examination, Wolf acknowledged that she is not a part of law enforcement and has no formal investigative training.

Testimony of Martha Rizk:

44. Rizk testified about an incident that occurred in May of 2024 and was the subject of a previous contempt hearing. Both Rizk and Preston were in their respective vehicles on a public road, when Preston, while passing Rizk's vehicle, rolled down her vehicle window and said to Rizk "so afraid" directed at Rizk.
45. Rizk testified in a general fashion that "they" published her full legal name on the internet. Rizk does not state specifically who "they" is or when this allegedly occurred.
46. Rizk testified that on December 7, 2025, when a video was posted online of Hales driving his truck in Florida, that this video made Rizk fearful for her safety because her whereabouts were being posted online.
47. Rizk testified in a general fashion that she has seen Preston and Cook participate in live chats and/or broadcasts with Two Lees in a Pod, Luthman and/or Volpe. Rizk did not present specific testimony related to the content of the broadcasts.
48. Rizk testified that "sometime in 2025" Lisa Lee went live from her YouTube channel and drove past the schoolhouse property looking for Rizk. Rizk stated that Lisa Lee has stated publicly that she is the public relations team for Preston.
49. On cross-examination, Rizk confirmed that her concerns related to Preston and Cook came from the third-party contact, which Rizk believed Preston and Cook allowed and/or encouraged.
50. On redirect, Rizk testified in a general fashion that Preston was actively helping third parties to harass Hales and Rizk by providing video footage of their vehicles traveling down a public road and participating in interviews and broadcasts.

Testimony of Corporal Dean MacIntyre of the Levy County Sheriff's office in Florida.

51. Corporal MacIntyre testified that he has interacted with Hales on at least three or four complaints related to Preston and Cook, and that he has determined probable cause did not exist to issue any criminal charges. Corporal MacIntyre testified about an investigation conducted by him on January 19, 2025 where Hales alleged that a violation of the no contact order occurred. Based on review of video, Corporal MacIntyre determined that no probable cause existed for a violation.
52. Corporal MacIntyre testified that based on his review of videos, in his opinion Hales was not trying to avoid Preston and/or Cook but was instead trying to elicit a response from them.
53. Upon cross-examination, Corporal MacIntyre noted that the January 19, 2025 incident was where Cook turned his back on Hales as Hales was filming and puts his two hands

behind his back. Corporal MacIntyre noted that it was "undiscernible" whether Cook was making an obscene hand gesture in the video.

54. Corporal MacIntyre admitted on cross-examination that there has been debate between the Levy County Sheriff's office and the state attorney's office as to whether to enforce the protection order from Ohio.

Testimony of W.O. "Brett" Beauchamp, Under Sheriff and Legal Advisor for Levy County Sheriff's office

55. Chief Beauchamp testified that there have been at least 10, maybe up to 25 deputies that have been involved in some manner with Hales, Preston and Cook. Beauchamp stated that in his opinion, the involvement of the deputies was to generate social media traffic to benefit Hales and his related businesses.
56. On cross-examination, Beauchamp confirmed that every complaint made by Hales and Rizk has been investigated by the Sheriff's office and no probable cause determination was made, and that is why the Ohio protection order was not enforced.

Hales rested at this time and the introduction of exhibits was held in abeyance pending presentation of the Respondent's testimony and witnesses. Respondents Preston and Cook testified and called as a witness Bruce Matzkin and Tina Haley.

Testimony of Bruce Matzkin:

57. Matzkin is an attorney that lives in Florida. Matzkin contacted Preston/Cook in March of 2024 after learning about the interactions between Hales and Preston/Cook. Matzkin testified that he was online searching for a law YouTuber when he came across the "bad neighbors saga."
58. Matzkin testified that he contacted Shara Wolf and they worked together. Wolf provided information to Matzkin to "bring him up to speed on the situation." Matzkin identified Respondents Exhibit 1, the email from Wolf to Matzkin that included a synopsis of the case between Hales and Preston/Cook. Matzkin denied that he forced, coerced or made Wolf prepare the document under any threat or duress. Matzkin testified that based upon his independent knowledge of the issues between Hales and Preston/Cook, that the email synopsis prepared by Wolf is an accurate summary of the issues at that time.
59. On cross-examination, Matzkin admitted that he contacted Preston, that Preston did not initially contact him.
60. Matzkin testified that he said "I want to destroy Jeremy Hales legally," and then upon further questioning acknowledged that the exact statement to Shara Wolf that his goal as to Hales was to "destroy this man and his You Tube empire." Matzkin did not deny

calling Hales a "psychopath douchebag" and did not deny having contact with the podcast, Two Lees in a Pod. Matzkin admitted that he has publicly stated on on-line channels that Hales is destroying the lives of Preston/Cook by the content posted by Hales.

61. Matzkin admitted that he has been in contact with Richard Luthman and that he has contributed a "small amount" of money to the fundraising efforts of Two Lees in a Pod to assist Preston/Cook.

62. On re-direct, Matzkin denied making any threats to harm Hales and denied inciting any other party to cause physical harm to Hales. Matzkin denied that the statement about taking down the YouTube empire of Hales was made at the direction or request of Preston and/or Cook. Matzkin testified that communications with other on-line personalities such as Luthman, Volpe or Two Lees in a Pod was not done at the direction or request of Preston and/or Cook. Matzkin denied that Preston and/or Cook had asked or directed him to threaten Hales.

Testimony of Tina Haley:

63. Tina Haley testified that she resides in Florida on Otter Creek Avenue and is a neighbor of Preston, Cook and Hales. Haley testified that she was present for the ten-foot video when Cook was walking in the road. Haley testified that Hales instigated the communications between himself and Cook. Haley testified about a property dispute that she had with Hales and provided no further testimony related to Preston/Cook.

Testimony of John Cook:

64. Upon questioning, Cook denied seeking out or interacting with Hales since the issuance of the initial civil stalking protection order. Cook denied verbally or physically threatening Hales. Cook denied asking or requesting others to cause Hales physical harm. Cook denied reaching out to any on-line personalities to threaten Hales or to cause him harm.

65. Cook testified that he has seen Hales twice in the past year; once in Walmart and then about two months ago at a hardware store. Cook testified that when he was leaving the hardware store that Hales was recording him. Cook did not deny that he had a gun on his person pursuant to the open carry law but denied brandishing or "showing" Hales his gun at the hardware store.

66. Cook testified that Hales will drive 5 miles per hour down their road while filming out his window directed at the Cook/Preston property. Cook testified that he has taken actions to

prevent Hales' ability to film Cook/Preston while they are on their own property. Cook testified that he put a six-foot privacy fence topped with 17" inches of tin to try and stop Hales from filming into the Preston/Cook property. Cook further testified that also put up 15-foot screening using plants in an attempt to block filming.

67. Cook testified that the ten-foot video was instigated by Hales to be used for YouTube content.
68. Cook denied that on January 19, 2026 that he gave Hales the middle finger when Hales drove by the Cook/Preston property. Cook testified that he had been up on a ladder and that he put his hands on his back to stretch his back.
69. Cook admitted that he had participated in the Two Lees in a Pod podcast. Cook denied being involved in a Facebook page called "Anti Slapp Watch Jeremy Hales." However, Cook did admit to posting on the Anti Slapp Facebook page "asking for prayers" to resolve this matter. Cook admitted that he went on Volpe's podcast and that he discussed this protection order.

Testimony of Lynette Preston:

70. Preston testified that the neighbor interactions with Hales began as normal neighborly interactions. Preston testified that during a conversation with Martha Rizk that she shared some person information regarding her relationship with Cook and that Rizk suggested that she give her child up for adoption. Preston was upset at this suggestion and asked Rizk to leave her property. It was after this interaction that the social media posting related to Preston and Cook started.
71. Preston testified that since the conversation with Rizk, that child protective services has been called 41 times on Preston, and that none of the allegations have been substantiated and she still has full custody of the child.
72. Preston denied having any contact with Hales since the protection order was put in place. Preston denied threatening physical harm to Hales. Preston denied directing or requesting any other individuals to threaten or harm Hales. Preston denied asking or directing Two Lees in Pod, Volpe, Luthman or Matzkin or any other internet personalities to go online and defame or talk about Hales.
73. Preston denied that Exhibit E, Slay the Narcissist post, was about Hales. Preston testified that she reposted the video and the intent was directed at Cook, not Hales.
74. Preston admitted that she posted a message on March 18, 2025 that people could watch Two Lees in a Pod to see both sides of the conflict. Preston further admitted that she posted a message that publicly thanked Lisa from Two Lees in a Pod for "everything they

have done for us", including donations to the minor child's Christmas and construction of a fence.

75. Preston was unaware of the source of funds to pay for Attorney Weatherly for the subject hearing.

76. Preston admitted that there is a camera on the fence that is pointed toward the public road. Preston testified that she and Cook control the cameras. Preston denied specifically sending the video in Exhibit K of Hales driving down the public road. Preston did admit that she has provided videos and other evidence to Two Lees In a Pod in the past to keep as evidence. Preston did not admit to sending the video footage in Exhibit K to Two Lees in a Pod, but also did not specifically deny that the video was from the cameras under her control.

77. Preston agreed that she has appeared online with Volpe and Two Lees in a Pod.

Law and analysis:

Assuming that evidence existed prior to the grant of the Original Petition, this Court must determine whether a preponderance of the evidence presented at the evidentiary hearing herein establishes the need for an extension or new protection order.

Past acts may serve as the basis for an extension of a civil protection order when coupled with new threats. *Studer v. Studer, 2012 Ohio 2838,* quoting *Welch v. Staggs*, 2009 Ohio 379. However, there must also be evidence that the Petitioner has a reasonable fear of serious physical harm based on new threats. *Id.*

This Court finds instructive the case of *M.J. v. L.P.*, 2016 Ohio 7080 wherein the Ninth District Court of Appeals reversed the trial court's grant of the civil stalking protection order and held that the continuation of a protection order cannot be based on 1) continued litigation of the original protection order including an appeal and a subsequently filed Motion for Relief from Judgment, 2) the filing of a civil lawsuit against petitioner, and 3) the fear that as soon as the protection order terminates, respondent will begin stalking her again.

The menacing by stalking statute provides "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person…" R.C. §2903.211(A)(1).

"Pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. §2903.211(D)(1). "When looking at a pattern of conduct, the court must take into consideration everything, i.e. …the phone calls, the thinly veiled threats, and the face-to-face meetings between the parties, even if some of [the respondent's] actions comprising this behavior, considered in isolation might not appear to be particularly threatening." *Fortney v. Willhoite*, 11th Dist. Lake No. 2011-L-120, 2012-Ohio-3024, ¶39 (internal citations omitted).

"A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. §2901.22(B).

"Physical harm" is defined as "any injury, illness, or other psychological impairment, regardless of its gravity or duration." R.C. § 2901.01(A)(3).

"Mental distress" is defined as any of the following: "(a) [a]ny mental illness or condition that involves some temporary substantial incapacity; (b) [a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. §2903.211(D)(2). The Ninth District Court of Appeals, when discussing "mental distress" within the meaning of R.C. §2903.211, has stated:

> The "substantial incapacity" component of mental distress "does not mean that the victim must be hospitalized, or totally unable to care for herself. Incapacity is substantial if it has a significant impact upon the victim's daily life." This Court has held that evidence demonstrating that a petitioner felt compelled to alter normal routines and patterns of behavior due to respondent's conduct corroborates allegations of mental distress. "Mere mental stress or annoyance, however, does not constitute mental distress for purposes of the menacing by stalking statute."
>
> Expert testimony is not necessary to establish that a victim experienced mental distress as a result of the offender's behavior in order to prove menacing by stalking. "Rather, it is the function of the trier of fact to determine whether a victim suffered mental distress as a result of the offender's behavior. Furthermore, no evidence that psychological treatment has been undertaken is necessary."

*E.B. v. J.B.*, 9th Dist. No. 19CA0071-M, 2021-Ohio-776, ¶13-14 (internal citations omitted).

The weight given to the evidence and the credibility of witnesses are issues for the trier of fact. *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). The trier of fact is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proferred testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77,80, 461 N.E.2d 1273 (1984).

When reviewing whether there is sufficient evidence that the petitioner was under fear of imminent serious physical harm, "the critical inquiry is 'whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent) serious physical harm." *State v. McKinney*, 2009 Ohio 2225, quoting *State v. Tackett*, 2005 Ohio 1437.

When carrying out this inquiry, to support the extension of a civil protection order, "[t]here must also be evidence the petitioner has a reasonable belief of serious physical harm based on new threats of domestic violence," *Studer v. Studer*, 131 Ohio App.3d 818, 822. This requirement of continued threats beyond those that gave rise to the initial civil protection order is necessary because "[t]he purpose of the civil protection order is not to address past abuse." *Wetterman v. B.C.*, 2013 Ohio 57.

At the evidentiary hearings held in this matter, Petitioner has failed to establish that either Preston or Cook has made new threats of violence against Petitioner. Additionally, the Court finds that there is no evidence that Petitioner has a reasonable belief of serious physical harm from Preston or Cook. The Court specifically finds that the actions of Petitioner have served to continue this litigation, including the filing of motions for contempt, and the filing of Second Petitions lacking in any new allegations specifically made at Preston and Cook. Petitioner has focused on what other people have done or said, specifically on social media, and has attempted to place the blame for these social media commentators at the feet of Preston and Cook. The Court does not find any evidence to support this attempt at blame. There was no evidence presented to the Court that Preston and/or Cook directed any third party to make threats or to communicate with Petitioner on behalf of Preston and/or Cook.

There was testimony and argument at the hearing that there is a social media "ecosystem" surrounding Petitioner and the allegation was made that Petitioner commenced and has continued these petitions monetize or create social media content. This Court will not make any findings that relate to the allegations made by counsel for Respondents that Hales has only pursued these

petitions to create content for his social media platforms. The Court does not find these allegations relevant to this matter.

Based on the testimony and evidence presented, this Court finds that Petitioner has failed to establish that there have been sufficient threats specifically made by Preston and/or Cook against Petitioner. Furthermore, the Court finds there is no evidence that Preston and/or Cook controlled or directed any third persons to make threats against Petitioner. The court further finds that Petitioner has failed to establish that he has a *reasonable* fear of serious physical harm based on the alleged threats. Petitioner's testimony revolves around third parties and social media/online content. Petitioner has failed to present evidence that Cook and/or Preston encouraged or directed any of the social media content.

In this matter and based on the consolidation of the Original Petitions and the Second Petitions, this Court has applied the same standard to both the Motion to Extend the Original Petitions as well as the Second Petitions. Based on the testimony and evidence presented, this Court DENIES the Motions to Modify the Original Petitions and DENIES the issuance of the Second Petitions. Furthermore, the Court finds that no specific evidence or argument was made as to the Fourth motion for contempt. Accordingly, the Fourth motion for contempt is DENIED.

CONCLUSION:

Petitioner's motions to extend the Original Petitions are DENIED. Petitioner's motions for a full civil stalking protection order on the Second Petitions are DENIED. Petitioner's Fourth motion for contempt is DENIED.

IT IS SO ORDERED

**Magistrate Kandi S. O'Connor**

APPROVED AND ADOPTED BY:

**Judge Susan Baker Ross**

# **Exhibit 10** Jeremy Hales' Recording Transcript

File: Hales Court Destroy.mp4
This is Jeremy Hales' own words to his viewers on his YouTube Channel "What the Hales"

**With regards to Marilyn Raby Case in Ohio:**
"You want to bleed the opposing side of every last penny that you possibly can until they are bankrupt, until they have nothing."

"You can do that in court and you can drag it out for years."

**With regard to Preston in 2023:**
"Even though they know they are going to lose everything in a lawsuit"

"A lawsuit isn't to win, a lawsuit is to make you spend all of your money on a lawyer and to bankrupt you. That's what the win is. I could care less if I win in a court situation. My goal is to make sure you have no money."

**In 2021 with regards to his Neighbor Susie (Lynette Prestons neighbor)**
"I could take this whole issue to court and I can bankrupt anybody who goes to court"
"You take the to court not to win, not to lose, You take them to court to bankrupt them"
"For me, it's a business expense. For them it would effect their life negateively"

**2023 Regarding Suing the town of Otter Creek, FL**
"If I go to court with the town of Otter Creek, the goal is not to win, the goal is to financially bankrupt. The goal is to remove those people, to place them in jail."

# **Exhibit 11** Shochet Bar Report

Ex H

11

98-369
Supreme Court of Arkansas

# Shochet v. Arkansas Bd. of Law Examiners

335 Ark. 176 (Ark. 1998) · 979 S.W.2d 888
Decided Nov 19, 1998

98-369

Opinion delivered November 19, 1998

1. ATTORNEY CLIENT — ADMISSION TO BAR — STANDARD ON REVIEW. — The applicant has the burden of proving eligibility for admission to the bar of the supreme court and must do so by a preponderance of the evidence; the supreme court reviews bar admission and reinstatement cases *de novo*, and it will not reverse the findings of fact of the Arkansas Board of Law Examiners unless they are clearly erroneous. 2. ATTORNEY CLIENT — FINDINGS OF BOARD NOT CLEARLY ERRONEOUS — APPELLANT ADMITTED COMMITTING
177 FRAUD, PERJURY, *177 and practicing dentistry on suspended license. — The findings of the Board of Law Examiners were not clearly erroneous where appellant admitted that he had committed insurance fraud and perjury, and there was evidence that he had practiced dentistry without a license; the Board properly considered this past misconduct in determining whether appellant possessed "good moral character"; the Board's determination that appellant was unable to accept responsibility for his actions was not clearly erroneous. 3. ATTORNEY CLIENT — APPELLANT FAILED TO ACCEPT RESPONSIBILITY FOR PREVIOUSLY ACKNOWLEDGED PAST MISCONDUCT — APPLICANT'S CONTINUED DENIAL OF ACT FOR WHICH HE OR SHE HAS BEEN FOUND GUILTY OR SANCTIONED IS UNACCEPTABLE. — Where appellant had not consistently maintained his innocence with respect to an unlicensed-practice charge, there was nothing that precluded the Board of Law Examiners from concluding, on the basis of appellant's testimony, that he had failed to accept responsibility for past misconduct that he had previously acknowledged and for which he had been sanctioned; an applicant's continued denial of an act for which he or she has been found guilty or sanctioned is unacceptable. 4. ATTORNEY CLIENT — ADMISSION TO BAR — EVIDENCE OF REFORM REHABILITATION IS RELEVANT TO DETERMINE APPLICANT'S PRESENT FITNESS TO PRACTICE LAW. — A fundamental rule in bar-admission cases is that evidence of reform and rehabilitation is relevant to determine an applicant's present fitness to practice law; if an applicant's behavior subsequent to the disqualifying misconduct convincingly demonstrates rehabilitation, it can overcome the adverse inference of unfitness arising from past misconduct, and if persuasive, it may support a finding of present fitness; an important aspect of "rehabilitation" is an applicant's candor about the past. 5. ATTORNEY CLIENT — ADMISSION TO BAR — BOARD'S FINDINGS THAT APPELLANT HAD GIVEN FALSE, MISLEADING, OR INCOMPLETE ANSWERS ON BOTH BAR SECURITIES LICENSE APPLICATIONS NOT CLEARLY ERRONEOUS. — On the "candor" issue, the findings of the Board of Law Examiners that appellant had given false, misleading, or incomplete answers on his bar-application character questionnaire and on his application for a securities license were not clearly erroneous;

these findings not only supplied an independent basis for the Board's decision to deny appellant's application but also demonstrated that appellant had not rehabilitated himself since the period of time in which he defrauded an insurance company, perjured himself before a state agency, and
178 practiced dentistry on a suspended license. *178 6. ATTORNEY CLIENT — ADMISSION TO BAR — NECESSARY CHARACTERISTICS FOR ESTABLISHING CANDIDATE'S GOOD MORAL CHARACTER. — Truthfulness, honesty, and candor are necessary characteristics for establishing a candidate's good moral character and hence his or her fitness to practice law; there simply is no place in the law for a man or woman who cannot or will not tell the truth, even when his or her own interests are involved; in the legal profession, there must be a reverence for the truth. 7. ATTORNEY CLIENT — ADMISSION TO BAR — HONESTY CANDOR ARE ABSOLUTE PREREQUISITES TO ADMISSION. — An applicant must respond fully and accurately to those questions posed in an application for admission to the bar; he or she has an unremitting duty of candor to all persons charged with investigating and passing upon his or her qualifications; moreover, the attributes of honesty and candor are absolute prerequisites to the admission to the bar. 8. ATTORNEY CLIENT — ADMISSION TO BAR — BOARD'S DECISION TO DENY APPELLANT'S APPLICATION AFFIRMED. — Where the Board of Law Examiners found that appellant was less than candid in his responses to two questions on the bar-application character questionnaire and one question on his application for a securities license, the supreme court could not say that the Board's findings were clearly erroneous; the Board's decision to deny appellant's application for admission was justified on the basis of his misconduct in his dentistry practice; his failure to accept responsibility for certain aspects of that misconduct; his failure to show that he has "rehabilitated" himself since engaging in that misconduct; and his lack of candor in answering questions on applications for professional licenses; the Board's decision denying appellant admission to the bar was affirmed.

Appeal from Arkansas Board of Law Examiners; affirmed.

*Appellant*, pro se.

*W. Frank Morledge, P.A.*, for appellee.

DAVID NEWBERN, Justice.

This is an appeal from a decision of the Arkansas Board of Law Examiners denying the application of appellant Randall Mark Shochet for admission to the Bar of this Court. Mr. Shochet has completed the necessary educational requirements, and he passed the Arkansas Bar Examination in July 1996. The Board determined, however, that Mr. Shochet failed to establish "good moral
179 character beyond a *179 preponderance of the evidence," as required by Rule XIII of the Rules Governing Admission to the Bar, and denied his application on that basis. Mr. Shochet argues on appeal that the Board's findings and conclusions underlying its decision are clearly erroneous. We affirm the Board's decision.

Mr. Shochet attended dental school in Florida after completing his undergraduate studies in 1981. He later moved to Missouri, where, in 1986, he obtained a license to practice dentistry. In 1990, the Missouri Dental Board filed a complaint before a state administrative agency claiming that Mr. Shochet, in 1988 and 1989, had billed an insurance company for dental services he had not rendered. The Dental Board also claimed that Mr. Shochet had provided its officials with false information during their investigation of the matter and that he had committed perjury while testifying before the Dental Board.

Mr. Shochet enrolled in the St. Louis University School of Law in August 1991. In February 1992, Mr. Shochet and the Missouri Dental Board resolved the matter described above. The Dental Board abandoned its perjury charge, and Mr.

Shochet admitted he had billed an insurance company for services he had not rendered. Mr. Shochet accepted a 120-day suspension of his dentist's license commencing April 1, 1992, and running through July 29, 1992.

In March 1992, prior to the commencement of the suspension period, Mr. Shochet entered into an agreement with Dr. Glenn D. Yowell providing for Dr. Yowell to assume Dr. Shochet's dentistry practice. The agreement provided as follows:

> Dr. Shochet agrees to furnish the dental facility located at [address given], including all equipment, instruments, and supplies to Dr. Yowell in exchange for an amount to be mutually agreed upon.
>
> Such reimbursal will not be measured against patient fees and billings, and is not "fee splitting." It is only based on the usage of the dental office.
>
> Dr. Yowell is to provide his own professional liability insurance.

180 *180

> Our relationship may be terminated on either side by either giving the other three (3) weeks notice of their intention to terminate.

Mr. Shochet and Dr. Yowell signed a separate document — a letter dated March 9, 1992, and written by Mr. Shochet — that reflected further details of their arrangement. Mr. Shochet referred to Dr. Yowell as "an independent contractor Dentist" and indicated that Dr. Yowell was to "perform dental services on our patients at our office by appointments set by us Monday thru Friday or to be amended by mutual agreement." The letter revealed that Mr. Shochet would pay Dr. Yowell "the sum equal to 25% of the collections made for [his] billable services." Mr. Shochet "guaranteed" Dr. Yowell "a minimum of $3000 a month."

Mr. Shochet returned to his dentistry practice at the conclusion of the suspension period. He completed a Uniform Application for Securities Industry Registration or Transfer in April 1993 and was issued a Series 7 Securities License. Mr. Shochet sold his dental practice and, in August 1993, returned to Florida, where he worked for his father's securities business.

In November 1993, the Missouri Dental Board filed a second complaint against Mr. Shochet alleging that he had practiced dentistry during the period in which his license was suspended. The Dental Board referred to the agreement between Mr. Shochet and Dr. Yowell. It alleged that payments from patients or third parties received for work done by Dr. Yowell and a Dr. Rivera had been "deposited into a bank account which was in the name of [Mr. Shochet]"; that Dr. Yowell had been paid for his services pursuant to the agreement; and that Mr. Shochet had submitted claim forms to insurance companies and had received payment for dental work rendered during the suspended period. The Dental Board alleged that Mr. Shochet's conduct violated regulatory provisions that prohibit a suspended dentist "from receiving any compensation from any person, group practice, partnership or corporate practice, or any dental office in this state, during the period of suspension or revocation" and from accepting "fees from any capitation or third party payment program to which he might otherwise be entitled."

181 *181

Mr. Shochet resumed his legal education at the University of Miami at Coral Gables School of Law in January 1994. In October 1994, Mr. Shochet and the Missouri Dental Board resolved the matter of his alleged practice upon a suspended license. Mr. Shochet admitted the Dental Board's allegations and surrendered his Missouri dentistry license. In December 1995, Mr. Shochet completed law school and earned his Juris Doctor degree.

On May 31, 1996, Mr. Shochet applied for admission to the Bar of this Court. Mr. Shochet was allowed to take the July 1996 bar examination subject to a continuing character and fitness investigation in the event that he passed the examination, which he did. The chairman of the Board of Law Examiners was unable to determine Mr. Shochet's eligibility, and Mr. Shochet appeared *pro se* at a hearing before three members of the Board and the Board's executive secretary.

By a vote of 10-1, the Board determined that Mr. Shochet failed to establish by a preponderance of the evidence that he possessed "good moral character" and, for that reason, denied his application for admission. The Board based its conclusion on (1) the facts surrounding the suspension and surrender of Mr. Shochet's Missouri dentist's license and his explanation of that situation to the Board during the hearing; (2) Mr. Shochet's responses to questions on both the Arkansas Bar Application Character Questionnaire and the application for the Series 7 Securities License, as well as his explanation of those responses made during the hearing; and (3) evidence that, in the Board's view, demonstrated Mr. Shochet's lack of "fiscal responsibility." Mr. Shochet now seeks reversal of the Board's decision and maintains that he "established sufficient good moral character" and should be admitted to the Bar of this Court.

[1] "The applicant has the burden of proving eligibility and must do so by a preponderance of the evidence." *Partin v. Bar*, 320 Ark. 37, 41, 894 S.W.2d 906, 908 (1995). *See* Rule XIII of the Rules Governing Admission to the Bar. "We review bar admission and reinstatement cases *de novo*, and we will not reverse the findings of fact of the Board unless they are clearly erroneous." *Partin v. Bar*; *supra*. *See In re Application of*
182 *Crossley*, 310 Ark. 435, *182 441, 839 S.W.2d 1, 3 (1992). We hold that the Board's findings are not clearly erroneous and affirm its decision denying Mr. Shochet's application for admission.

### *1. The Missouri dental license*

The Board's decision rested in part on its factual findings concerning the suspension and surrender of Mr. Shochet's Missouri dentist's license. As mentioned, Mr. Shochet was suspended from the practice of dentistry in Missouri based on his admission to having billed an insurance company for services not rendered. Mr. Shochet admitted his culpability as to that allegation during the hearing, and, although the Missouri Dental Board had dropped its perjury charge, Mr. Shochet further admitted in the hearing that he had indeed committed perjury before the Missouri Dental Board. The Board found that Mr. Shochet "knowingly engaged in fraud and misrepresentation by billing for services not rendered during the period of 1988-1989. Further, the applicant resorted to perjury to thwart the investigative efforts of the Missouri Dental Board."

Mr. Shochet later surrendered his dentist's license following his admission that he had practiced dentistry during the period in which his license was suspended. During the hearing before the Board, however, Mr. Shochet maintained that he had done "nothing wrong" with respect to the unlicensed-practice charge. He conceded that, "legally," he had engaged in the unlicensed practice of dentistry, but he asserted that his actions were based upon the advice of counsel. Mr. Shochet testified that he chose to admit to the Missouri Dental Board's allegations and surrender his dentist's license only because (1) he wanted to foreclose the possibility of having his license *revoked*, which he perceived as a more severe sanction; (2) he lacked the financial resources to defend the charge; and (3) he saw no "purpose" in defending the charge because he was living in Florida and attending law school there, he did not intend to use his Missouri dentist's license again, and he planned to pursue a legal and dentistry
183 practice in Florida. *183

The Board found that Mr. Shochet

now denies responsibility for practicing dentistry while his license was suspended. He avers that his actions were based upon advice from his attorneys. He also suggests that his admission of culpability was a matter of expediency and convenience.

The record shows that on January 15, 1992, prior to the beginning of the suspension period, the applicant's attorney set forth the circumstances under which the applicant could "rent" his office during the period of suspension. That letter made clear that the suspension prohibited the applicant from drawing any income from patients.

By letter of March 9, 1992, the applicant, apparently without assistance of legal counsel, entered into an agreement with Dr. Glenn D. Yowell. Through the agreement with Dr. Yowell, he (the applicant) would control appointments, billing and equipment, etc. Any sums collected which exceeded Dr. Yowell's 25% and office expenses would flow as income to the applicant.

The applicant associated Dr. Yowell as an "independent contractor" to continue receipt of patient income, contrary to the terms of his license suspension. Further, a majority of the Board gives little weight to the applicant's protestations that his arrangement with Dr. Yowell was based upon legal advice and that his admission of culpability was solely to avoid further litigation.

We cannot say that these findings of the Board of Law Examiners are clearly erroneous. Mr. Shochet admitted that he committed insurance fraud and perjury, and the Board properly considered this past misconduct in determining whether Mr. Shochet's possessed "good moral character."

It also was appropriate for the Board to take into account Mr. Shochet's practice of dentistry on a suspended license — misconduct that Mr. Shochet acknowledged in administrative proceedings in Missouri. In the hearing before the Arkansas Board of Law Examiners, however, Mr. Shochet denied responsibility for his misconduct. He asserted that his counsel had approved his plans for the operation of his dentist's office during the suspension period, and he suggested that his
184 admission to the unlicensed-practice *184 charge was motivated, in the words of the Board, only by "expediency and convenience."

[2] The Board obviously found Mr. Shochet's explanation disingenuous. It determined that Mr. Shochet was unable "to accept responsibility for his actions," and we cannot say that determination was clearly erroneous.

Nor is the Board's finding on this point contrary to the rule established in *Florida Board of Bar Examiners re G.J.G.*, 709 So.2d 1377 (Fla. 1998); *Florida Board of Bar Examiners re M.C.A.*, 650 So.2d 34 (Fla. 1995); and *Martin B. v. Committee of Bar Examiners*, 661 P.2d 160 (Cal. 1983), which are cited by Mr. Shochet. According to those cases, an applicant should not be denied admission on account of his or her assertion of innocence regarding a charge of past misconduct where the applicant has not been found "guilty" of the charge and has consistently maintained his or her innocence with respect to it.

[3] Those cases do not assist Mr. Shochet here. Mr. Shochet has not consistently maintained his innocence with respect to the unlicensed-practice charge. He admitted the truth of the charge in proceedings before a Missouri agency and agreed to surrender his dentist's license. In the hearing before the Board of Law Examiners, however, Mr. Shochet changed his story, blamed his former attorneys, and essentially attempted to retract his prior admission of guilt. We find nothing in the cases cited by Mr. Shochet that precluded the Board from concluding, on the basis of Mr.

Shochet's testimony, that he failed to accept responsibility for past misconduct that he previously acknowledged and for which he was sanctioned. An applicant's "continued denial" of an act for which he or she has been found guilty or sanctioned "does not serve the applicant well" in bar-admission proceedings and is, in fact, "unacceptable." *Florida Board of Bar Examiners re G.J.G.*, 709 So.2d at 1381.

## 2. Candor

**[4]** The effect of Mr. Shochet's unlicensed practice of dentistry upon his bar application, and perhaps the effect of his commission of insurance fraud
185 and perjury, might have been *185 diminished had Mr. Shochet shown that he had undergone "successful rehabilitative efforts." *Partin v. Bar*, 320 Ark. at 45, 894 S.W.2d at 910. As the Supreme Court of New Jersey observed,

> [a] fundamental rule in bar admission cases is that evidence of reform and rehabilitation is relevant to determine an applicant's present fitness to practice law. If an applicant's behavior subsequent to the disqualifying misconduct convincingly demonstrates rehabilitation, it can overcome the adverse inference of unfitness arising from past misconduct, and if persuasive, it may support a finding of present fitness.

*Application of Jenkins*, 94 N.J. 458, 467 A.2d 1084, 1091 (1983).

As we said in the *Partin* case, however, an important aspect of "rehabilitation" is an applicant's "candor about the past." *Partin v. Bar, supra. See also Application of Jenkins*, 467 A.2d at 1091 (stating that "[o]ne particularly relevant type" of evidence that is "probative of reform and rehabilitation" is "candor before the Committee").

**[5]** On the "candor" issue, the Board found that Mr. Shochet had given false, misleading, or incomplete answers on his May 1996 Arkansas Bar Application Character Questionnaire and on his April 1993 application for a Series 7 Securities License. As we cannot say the Board's findings on this point are clearly erroneous, those findings not only supply an independent basis for the Board's decision to deny Mr. Shochet's application but also demonstrate that Mr. Shochet has *not* rehabilitated himself since the period of time in which he defrauded an insurance company, perjured himself before a state agency, and practiced dentistry on a suspended license.

The Board found that Mr. Shochet was asked in Question 9(c) of the Arkansas Bar Application Character Questionnaire whether he had ever been accused of fraud. Although it is undisputed that the Missouri Dental Board had accused Mr. Shochet of insurance fraud and that Mr. Shochet had *admitted* to that misconduct, he answered "no" to Question 9(c). Mr. Shochet testified that, in consultation with counsel, he answered "no" to Question 9(c) because he concluded that the insurance-fraud matter was addressed in his
186 answer to Question 15(d), which inquired *186 whether a licensing authority had ever taken any disciplinary action against Mr. Shochet. Mr. Shochet admitted, however, that it would have been "better" to have responded "yes" to Question 9(c).

The Board also found that Mr. Shochet was asked in Question 15(a) of the Arkansas Bar Application Character Questionnaire whether he had "ever applied for a license, other than as an attorney at law, the procurement of which required proof of good moral character or examination (i.e., certified public accountant, patent attorney, real estate broker, etc.)." Although Mr. Shochet had applied for, and received, a Series 7 Securities License, and although that process required proof of "good moral character," Mr. Shochet failed to disclose the Series 7 Securities License in his answer to Question 15(a). In the hearing, Mr. Shochet acknowledged that he had failed to list the securities license, expressed regret for the omission, and said that he had "no excuse." He

then sought to justify his incomplete answer, however, by arguing that he was not really a "stockbroker."

Finally, the Board found that, in his application for the Series 7 Securities License, Mr. Shochet was asked whether any federal or state regulatory agency or foreign financial regulatory authority had ever found him to "have made a false statement or omission or been dishonest, unfair, or unethical." Again, although Mr. Shochet had admitted to the charge of insurance fraud filed by the Missouri Dental Board, he answered "no" to this question. He testified before the Board that his answer had resulted from "advice of counsel" and his misunderstanding of a "poorly worded question."

The Board found that Mr. Shochet's

> responses to the various inquiries noted above [evince] a pattern of less than full disclosure to the Arkansas Board of Law Examiners and the Securities Licensing Authority. The applicant again attempts to shift responsibility either to "advice of counsel" or his misunderstanding of poorly worded questions.

187 *187

The Board later concluded that Mr. Shochet

> has engaged in false and deceptive practices in completing the various applications for professional licenses. The instances where the applicant either chose to mislead or failed to fully inform are numerous. The initial willful fraud arose in connection with the first proceeding brought by the Missouri Dental Board in 1990. The record shows that the applicant has continued to engage in behavior which brings into question the applicant's ability to accept responsibility for his actions and his capacity for truthfulness and candor.

**[6]** Truthfulness, honesty, and candor are "necessary characteristics for establishing a candidate's good moral character and hence his or her fitness to practice law." *Application of Jenkins*, 467 A.2d at 1088. There simply is "no place in the law for a man or woman who cannot or will not tell the truth, even when his or her own interests are involved. In the legal profession, there must be a reverence for the truth." *Id.* at 1091 (quoting *In re Hyra*, 15 N.J. 252, 104 A.2d 609 (1954)).

**[7]** An applicant must "respond fully and accurately to those questions posed in an application for admission to the bar." *In re Ascher*, 81 Ill.2d 485, 411 N.E.2d 1, 7 (1980). He or she has an "unremitting duty of candor to all persons charged with investigating and passing upon" his or her qualifications. *Kosseff v. Board of Bar Examiners*, 475 A.2d 349, 353 (Del. 1984). "Moreover, the attributes of honesty and candor are *absolute* prerequisites to the admission to our Bar." *Id.* (emphasis added). *See also In re Green*, 464 A.2d 881 (Del. 1983); *In re Beasley*, 243 Ga. 134, 252 S.E.2d 615 (1979); *Application of Walker*, 112 Ariz. 134, 539 P.2d 891 (1975); *In re Willis*, 215 S.E.2d 771 (N.C. 1975). *See* CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 15.3.2, at p. 863 (1986).

Here, the Board found that Mr. Shochet was less than candid in his responses to two questions on the Arkansas Bar Application Character Questionnaire and one question on his application for a Series 7 Securities License. We cannot say the Board's findings are clearly erroneous. Mr. Shochet offered explanations for his answers, but we cannot say that the Board erred by finding that his explanations were not credible, as it apparently
188 did. *188 **[8]** The Board's decision to deny Mr. Shochet's application for admission was justified on the basis of Mr. Shochet's misconduct in his dentistry practice in Missouri; his failure to accept responsibility for certain aspects of that misconduct; his failure to show that he has "rehabilitated" himself since engaging in that misconduct; and his lack of candor in answering

questions on applications for professional licenses. Because we affirm the Board's decision on the basis of these factors, it is unnecessary to discuss the Board's additional finding that Mr. Shochet displayed a lack of "fiscal responsibility."

Affirmed.

casetext
Part of Thomson Reuters

# **Exhibit 12** Levens Order

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
STATE OF FLORIDA, IN AND FOR HILLSBOROUGH COUNTY
CIRCUIT CIVIL DIVISION

NORMAN KLEIN and ARVILLA KLEIN,
Plaintiffs,

vs.

AVATAR PROPERTY & CASUALTY INSURANCE COMPANY,
Defendants.

Case No. 16-CA-1977

Division K

Ex H

12

**ORDER DENYING PLAINTIFFS' VERIFIED MOTION FOR RELIEF FROM FINAL JUDGMENT**

THIS CASE was before the Court on October 11, 2016, for consideration of the above-entitled motion. After reviewing the motion of plaintiffs' counsel and the response by defendant's counsel, and considering argument of counsel, the motion is DENIED.

Of greater concern to this court is the fact that plaintiff's counsel of record, Mr. Shochet, has made various sworn representation in his motion, that appear to be blatantly false. This court is forwarding a copy of this Order and the defense written response filed October 7, 2016, to the Florida Bar for review and such action as it deems appropriate.

DONE AND ORDERED at Tampa, Florida, on October 13, 2016.

16-CA-001977 10/13/2016 11:53:18 A

16-CA-001977 10/13/2016 11:53:18 AM

William P. Levens
CIRCUIT JUDGE

Copies furnished electronically
to counsel registered for this case
via JAWS



EXHIBIT D

# **Exhibit 13** Security Stills of Property Inspection





# Exhibit 14 – Pending Bar Complaints

# The Florida Bar

Tallahassee Branch Office
651 East Jefferson Street
Tallahassee, FL 32399
(850) 561-5845

Joshua E. Doyle
Executive Director

850/561-5600
www.floridabar.org

October 13, 2026

EX H

14

**Via E-Mail to rshochet@shochetlaw.com**

Randall Mark Shochet
409 N Main Street
Trenton, FL 32693-3443

Re: Complaint of Leslie Ferderigos against Randall Mark Shochet
The Florida Bar File No. 2026-00,678(8B)

Dear Mr. Shochet:

Please be advised that this case is being transferred to the Tallahassee Branch Office of The Florida Bar and will be assigned to Lauren Michelle Williams for additional investigation. You may be contacted by bar counsel or a bar investigator to provide additional information.

Please send all future correspondence in this matter, referencing the above case number to the attention of the undersigned, preferably by electronic mail or by U.S. Mail at the following address:

Lauren Michelle Williams
The Florida Bar
Tallahassee Branch Office
651 East Jefferson Street
Tallahassee, FL 32399
lwilliams@floridabar.org and rarnett@floridabar.org

Both the complainant and the respondent are directed to notify this office, in writing, of any pending civil, criminal, or administrative litigation which pertains to this grievance. Please note that this is a continuing obligation should new litigation develop during the pendency of this matter.

This complaint may still be closed after further review by bar counsel at the branch because of the lack of objective evidence to establish a violation of the Rules Regulating The Florida Bar under the Supreme Court's high evidentiary burden of clear

and convincing evidence. Additionally, bar staff may close some cases where the matter is better addressed by the civil or criminal courts. Staff also may close a case with the applicable grievance committee chair's approval by referring the lawyer to an educational professionalism enhancement program or by determining that a rule violation does not warrant discipline under relevant rules and case law.

As this matter proceeds forward, the bar requests your patience, as the investigation and disciplinary process can be lengthy. Most complaints, even those referred to the branch, are closed at the staff level. Should the bar determine to proceed with this complaint, the next stage would be referral to a grievance committee, which acts as a grand jury to determine whether there is probable cause to believe the lawyer violated the Rules Regulating The Florida Bar that warrant discipline. If there are other relevant proceedings pending, the bar may defer disciplinary proceedings until the other matter is complete.

Any possible discipline is directed at the lawyer's bar license and potentially affects only that lawyer's ability to practice law. Even in cases where discipline is appropriate, the disciplinary action is taken against the lawyer's licensure, it will not affect or overturn the outcome of any civil or criminal proceeding, and likely will not result in a refund of the fee paid to the lawyer in this matter.

The bar hopes that the above information is helpful regarding the next stages of the discipline process. If you have any questions or comments, please do not hesitate to contact me.

Sincerely,



Lauren Michelle Williams
Bar Counsel

cc: Leslie Ferderigos, Complainant via email to lannaonthego@gmail.com

EXH 14

# The Florida Bar

Tallahassee Branch Office
651 East Jefferson Street
Tallahassee, FL 32399
(850) 561-5845

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.floridabar.org**

September 23, 2026

**Via E-Mail to rshochet@shochetlaw.com**

Randall Mark Shochet
409 N Main Street
Trenton, FL 32693-3443

Re: Complaint of Robert J. Kezsey against Randall Mark Shochet
The Florida Bar File No. 2026-00,712(8B)

Dear Mr. Shochet:

Please be advised that this case is being transferred to the Tallahassee Branch Office of The Florida Bar and will be assigned to Lauren Michelle Williams for additional investigation. You may be contacted by bar counsel or a bar investigator to provide additional information.

Please send all future correspondence in this matter, referencing the above case number to the attention of the undersigned, preferably by electronic mail or by U.S. Mail at the following address:

Lauren Michelle Williams
The Florida Bar
Tallahassee Branch Office
651 East Jefferson Street
Tallahassee, FL 32399
lwilliams@floridabar.org and rarnett@floridabar.org

Both the complainant and the respondent are directed to notify this office, in writing, of any pending civil, criminal, or administrative litigation which pertains to this grievance. Please note that this is a continuing obligation should new litigation develop during the pendency of this matter.

This complaint may still be closed after further review by bar counsel at the branch because of the lack of objective evidence to establish a violation of the Rules Regulating The Florida Bar under the Supreme Court's high evidentiary burden of clear

and convincing evidence. Additionally, bar staff may close some cases where the matter is better addressed by the civil or criminal courts. Staff also may close a case with the applicable grievance committee chair's approval by referring the lawyer to an educational professionalism enhancement program or by determining that a rule violation does not warrant discipline under relevant rules and case law.

As this matter proceeds forward, the bar requests your patience, as the investigation and disciplinary process can be lengthy. Most complaints, even those referred to the branch, are closed at the staff level. Should the bar determine to proceed with this complaint, the next stage would be referral to a grievance committee, which acts as a grand jury to determine whether there is probable cause to believe the lawyer violated the Rules Regulating The Florida Bar that warrant discipline. If there are other relevant proceedings pending, the bar may defer disciplinary proceedings until the other matter is complete.

Any possible discipline is directed at the lawyer's bar license and potentially affects only that lawyer's ability to practice law. Even in cases where discipline is appropriate, the disciplinary action is taken against the lawyer's licensure, it will not affect or overturn the outcome of any civil or criminal proceeding, and likely will not result in a refund of the fee paid to the lawyer in this matter.

The bar hopes that the above information is helpful regarding the next stages of the discipline process. If you have any questions or comments, please do not hesitate to contact me.

Sincerely,

Lauren Michelle Williams
Bar Counsel

cc: Robert J. Kezsey, Complainant via email to robbie@keszeybrothers.com

EXH 14

The Florida Bar
Tallahassee Branch Office
651 East Jefferson Street
Tallahassee, FL 32399
(850) 561-5845

Joshua E. Doyle
Executive Director

850/561-5600
www.floridabar.org

October 13, 2026

**Via E-Mail to rshochet@shochetlaw.com**

Randall Mark Shochet
409 N Main Street
Trenton, FL 32693-3443

Re: Complaint of Lynette Michelle Preston against Randall Mark Shochet
The Florida Bar File No. 2026-00,681(8B)

Dear Mr. Shochet:

Please be advised that this case is being transferred to the Tallahassee Branch Office of The Florida Bar and will be assigned to Lauren Michelle Williams for additional investigation. You may be contacted by bar counsel or a bar investigator to provide additional information.

Please send all future correspondence in this matter, referencing the above case number to the attention of the undersigned, preferably by electronic mail or by U.S. Mail at the following address:

Lauren Michelle Williams
The Florida Bar
Tallahassee Branch Office
651 East Jefferson Street
Tallahassee, FL 32399
lwilliams@floridabar.org and rarnett@floridabar.org

Both the complainant and the respondent are directed to notify this office, in writing, of any pending civil, criminal, or administrative litigation which pertains to this grievance. Please note that this is a continuing obligation should new litigation develop during the pendency of this matter.

This complaint may still be closed after further review by bar counsel at the branch because of the lack of objective evidence to establish a violation of the Rules Regulating The Florida Bar under the Supreme Court's high evidentiary burden of clear

and convincing evidence. Additionally, bar staff may close some cases where the matter is better addressed by the civil or criminal courts. Staff also may close a case with the applicable grievance committee chair's approval by referring the lawyer to an educational professionalism enhancement program or by determining that a rule violation does not warrant discipline under relevant rules and case law.

As this matter proceeds forward, the bar requests your patience, as the investigation and disciplinary process can be lengthy. Most complaints, even those referred to the branch, are closed at the staff level. Should the bar determine to proceed with this complaint, the next stage would be referral to a grievance committee, which acts as a grand jury to determine whether there is probable cause to believe the lawyer violated the Rules Regulating The Florida Bar that warrant discipline. If there are other relevant proceedings pending, the bar may defer disciplinary proceedings until the other matter is complete.

Any possible discipline is directed at the lawyer's bar license and potentially affects only that lawyer's ability to practice law. Even in cases where discipline is appropriate, the disciplinary action is taken against the lawyer's licensure, it will not affect or overturn the outcome of any civil or criminal proceeding, and likely will not result in a refund of the fee paid to the lawyer in this matter.

The bar hopes that the above information is helpful regarding the next stages of the discipline process. If you have any questions or comments, please do not hesitate to contact me.

Sincerely,

Lauren Michelle Williams
Bar Counsel

cc: Lynette Michelle Preston, Complainant via email to
Michelle_preston06@yahoo.com

9:13

BranchAcknowledgement...

651 East Jefferson Street
Tallahassee, FL 32399
(850) 561-5846

Joshua E. Doyle
Executive Director

850/561-5600
www.floridabar.org

EX H

14

October 13, 2026

Via E-Mail to rshochet@shochetlaw.com

Randall Mark Shochet
409 N Main Street
Trenton, FL 32693-3443

Re: Complaint of John Cook against Randall Mark Shochet
The Florida Bar File No. 2026-00,682(8B)

Dear Mr. Shochet:

Please be advised that this case is being transferred to the Tallahassee Branch Office of The Florida Bar and will be assigned to Lauren Michelle Williams for additional investigation. You may be contacted by bar counsel or a bar investigator to provide additional information.

Please send all future correspondence in this matter, referencing the above case number to the attention of the undersigned, preferably by electronic mail or by U.S. Mail at the following address:

Lauren Michelle Williams
The Florida Bar
Tallahassee Branch Office
651 East Jefferson Street
Tallahassee, FL 32399
lwilliams@floridabar.org and rarnett@floridabar.org

Both the complainant and the respondent are directed to notify this office, in writing, of any pending civil, criminal, or administrative litigation which pertains to this grievance. Please note that this is a continuing obligation should new litigation develop during the pendency of this matter.

This complaint may still be closed after further review by bar counsel at the branch because of the lack of objective evidence to establish a violation of the Rules Regulating The Florida Bar under the Supreme Court's high evidentiary burden of clear and convincing evidence. Additionally, bar staff may close some cases where the matter is better addressed by the civil or criminal courts. Staff also may close a case with the applicable grievance committee chair's approval by referring the lawyer to an educational professionalism enhancement program or by determining that a rule violation does not warrant discipline under relevant rules and case law.

As this matter proceeds forward, the bar requests your patience, as the investigation and disciplinary process can be lengthy. Most complaints, even those referred to the branch, are closed at the staff level. Should the bar determine to proceed with this complaint, the next stage would be referral to a grievance committee, which acts as a grand jury to determine whether there is probable cause to believe the lawyer violated the Rules Regulating The Florida Bar that warrant discipline. If there are other relevant proceedings pending, the bar may defer disciplinary proceedings until the other matter is complete.

Any possible discipline is directed at the lawyer's bar license and potentially affects only that lawyer's ability to practice law. Even in cases where discipline is appropriate, the disciplinary action is taken against the lawyer's licensure, it will not affect or overturn the outcome of any civil or criminal proceeding, and likely will not result in a refund of the fee paid to the lawyer in this matter.

The bar hopes that the above information is helpful regarding the next stages of the discipline process. If you have any questions or comments, please do not hesitate to contact me.

Sincerely,

Lauren Michelle Williams
Bar Counsel

# Exhibit 15 September 25 Order, Bankruptcy (Doc 165)

EXH 15

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

IN RE:

LYNETTE MICHELLE LACEY
ALEXIS PRESTON,

CASE NO. 25-10173-MWC
CHAPTER: 7

Debtor.
_______________________________/

**ORDER GRANTING IN PART AND DENYING IN PART *CREDITOR JEREMY HALES'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DUCES TECUM AND FOR CONTEMPT AGAINST NONPARTY LISA LEE* (Doc. 148) AND GRANTING IN PART AND DENYING IN PART *NONPARTY LISA LEE'S MOTION TO QUASH SUBPOENA, FOR PROTECTIVE ORDER, TO DETERMINE SERVICE INEFFECTIVE, AND TO PRESERVE CONSTITUTIONAL AND JOURNALISTIC PRIVILEGES* (Doc. 144)**

THIS CASE is before the Court on *Creditor Jeremy Hales's Motion to Compel Compliance with Subpoena Duces Tecum and for Contempt Against Nonparty Lisa Lee* ("Motion to Compel," Doc. 148); *Nonparty Lisa Lee's Motion to Quash Subpoena, for Protective Order, to Determine Service Ineffective, and to Preserve Constitutional and Journalistic Privileges* ("Motion to Quash," Doc. 144); *Supplemental Declaration of Lisa Lee in Support of her Opposition, Motion to Quash, and Request for Protective* (Doc. 160); and *Nonparty Lisa Lee's Response and*

*Memorandum in Opposition to Creditor Jeremy Hales's Motion to Compel Compliance with Subpoena Duces Tecum and for Contempt* (Doc. 161). A hearing was held on September 15, 2026. Counsels for Creditor Jeremy Hales were present, counsel for Debtor was present, Counsel for the chapter 7 trustee, and Lisa Lee was present. The Court heard arguments of the parties at the hearing and considered the pleadings filed in this case.

**IT IS ORDERED:**

1. The Motion to Quash (Doc. 144) is GRANTED in part. Lisa Lee raised objections by email with Creditor's Counsel timely and subsequently filed her objections with this Court on August 17, 2026.
2. Lisa Lee will not be required to produce the materials and documents requested in the Subpoena in Request No. 3, Request No. 4, and Request No. 5. Said requests are not material to this case, are overly broad and burdensome, and are not likely to lead to the discovery of relevant information.

3. As to the allegations in the Motion to Quash that nonparty Lisa Lee was not served, the Court finds Ms. Lee was served.[1]

4. As to the other objections raised by nonparty Lisa Lee regarding constitutional and journalistic privileges, the Court did not have to address those matters and thus does not enter a ruling as Ms. Lee agreed to produce the materials the Court orders below.

5. The Motion to Compel is GRANTED in part. Nonparty Lisa Lee will provide the following items to Creditor Jeremy Hales within fourteen (14) days of entry of this order:

   a. Request No. 1: The complete Broadcast Video. A true, correct, unedited, and unaltered, digital copy of the entire video and audio recording of the Broadcast featuring the Debtor, including any portions that were edited out, deleted, or archived from public view.

   b. Request No. 2: Communications with Debtor. All Communications between nonparty Lisa Lee and the Debtor,

---

[1] See In re Combs, 668 B.R. 896 (Bankr. M.D. Fla. 2025) (holding service of a subpoena of a non-party's spouse at the spouse's residence was proper service as it was reasonably calculated to ensure the non-party received the subpoena).

from April 1, 2026, regarding the content and scheduling of the Broadcast.

6. All other materials requested in the Subpoena to nonparty Lisa Lee d/b/a Two Lees in a Pod are disallowed and will not be produced by nonparty Lisa Lee.

7. The Court does not find nonparty Lisa Lee in contempt and Creditor's request for attorney's fees and costs, and all other relief requested in the Motion to Compel is denied.

**DONE and ORDERED** on September 25, 2026.

MARY W. COLÓN
Chief U.S. Bankruptcy Judge

Creditor's counsel is directed to serve a copy of this order on interested parties and file a proof of service within 3 business days of entry of this order.

# Exhibit 16 October 18, 2026 Broadcast, Transcript




YouTube Channel: What the Hales
URL: https://www.youtube.com/watch?v=J2YZ1if-S9c&t

Timestamps:
3:28 up with everything going on. Here's what I can absolutely definitively share with

3:35 you. Now we know or you know that due to federal bankruptcy court there was an

3:43 inspection of Lynette's turd purgatory. Now Lynette has been very vocal about this. She's actually stated quite a few things that

3:52 some things she legally could state and some things are violations of the actual agreement for the inspection if we could

4:00 even call it an inspection. And I'm going to get to that. So she has violated some things and she has not violated other things. She has freedom

4:08 of speech in some realms and there's other areas where her and Crook have completely and totally violated the

4:15 agreement. So the funny thing is there's this whole shirt gray shirt drama, right?

4:24 Well, here's the problem and it's rather disgusting to be quite frank with you. Here is the problem.

4:33 My sources share with me that John Crook was not wearing a shirt during this

4:42 inspection. Therefore, how could I ever utilize a picture of him in a gray nasty

4:49 shirt from the inspection if he was shirtless? And I assure you, it will make you vomit.

5:01 Now, I've done a little bit of digging.

5:04 As a matter of fact, Da West actually, who is a phenomenal friend and a
5:11 phenomenal employee, Dian West actually sent me the picture that I've been using for months of John Crook. As a matter of

5:20 fact, Danna West took the picture and I took the liberty to go back and find out because I think this is so hilarious of

5:27 what they're saying. Da West took the picture on June 21st, 2026. June 21st, 2026.

5:37 Anybody know anything special about that day? Anybody at all? Anybody want to guess what day that was? June 21st,

5:46 If you right now are going, hold a second. June 21st, 2026. That was Father's Day. Oh my Oh,

5:56 Father's Day in Florida and the rest of the world. Now, here's the issue.

6:06 John Crook, instead of actually celebrating Father's Day, I will read the message as it was sent

6:14 to me. I did not ask Diana uh about sharing this beforehand, although she does not care. I can guarantee you that.

6:22 and uh all images and all things along those lines are um well, let's just read it. Here we go. So, she sends me the

6:30 image. She and Gina were together. I have the image right here in my messages. And she says, "As we were headed back to the ranch to release the

6:38 snake and check on everything, Crook was outside getting ready to hang the banners so he could irritate Willis with

6:45 the banners that they purchased for the sole purpose of instigating and being disgusting human 3/4 beings like they are."

6:53 And this is the beautiful part. She goes, "I guess Crook doesn't have any children, so he's got nothing to celebrate today, so he's got plenty of

7:01 time to be out there hanging useless banners up."

7:09 oh my goodness. So, um, the image that has been talked about, some of you are aware of it, some of you aren't aware of

7:17 it. I've been using since Father's Day, June 21st, 2026, which was taken of Crook outside of the gate, the fence.

7:27 And obviously, I crop and I trim and I put that in the place of the images or the person who makes images for me crops

7:36 and trims. And we have we have a we're going to have a good time. We're going to have a really good time because

7:43 they're going to have a major issue in federal court because Crook

7:49 wasn't wearing a shirt. Oh boy. Oh, this is going to be a problem. This is going to be a major problem. As a matter of

7:56 fact, I have no problem sharing with you. And by the way, I have clearance to share all these things with you. I've already been complete and total uh

8:04 discussions with my legal team and the federal bankruptcy team as well to what I can and what I cannot share. So, we're all good there. I can share with you

8:12 100% the trustee is beyond infuriated and is beyond aggravated number one with

8:20 hearing from Flea. Okay. Uh as a matter of fact, this has been put in writing the annoyance of FIA. Now, Fissa is

8:29 commanded or ordered, court-ordered to share information, and she's been withholding who she's blind carbon carbon copying all of her emails to,

8:37 which the trustee outs her to Randy and myself.

8:42 Ah, she's got another bit of a problem coming as well, but we're not going to get into that tonight. What we are going to get into is they hindered

8:52 this inspection. Now, Lynette is such a fool. She's going on and on and on about this inspection

9:01 online in comments, in live streams, posting, going live in videos, and stating this

9:09 is a survey of the property. How stupid can she be? This is not a survey of her property. The inspection, it happened,

9:18 but it was hindered. This is not an survey of a property. This is the

9:24 inspector going in and taking account of every single item worth money.

9:34 They were they did not allow the inspector to take

9:43 a full inventory and survey of assets that the federal bankruptcy owns. Lette

9:52 and Crook do not even legally own that property right now. The trustee owns the

10:00 property. The trustee is the one brokering with me. The trustee has legal

10:07 ownership, not them. She is in a bankruptcy. Then there's an inspector

10:14 that comes in. This is not a survey as she's saying such stupid stuff online like, "I don't know why there's not a

10:21 survey. This property has been surveyed so many times." It's not a survey. It is

10:27 an assessment of all things of value that now are owned legally by the

10:35 trustee which the trustee is selling to satisfy the debts,

10:44 you know, the creditors. Which is why the trustee has come to me three times

10:50 now with offers for the property. But not just the property, all

10:57 all assets and the property, which now you have Linette stating, "We're giving this away, we're donating this, we're

11:05 throwing this away, we're packing up, this isn't going." To say that

11:12 Saran Wrap is beyond upset with Lynette is the understatement of the year.

11:20 the trustee even stating, "You have lost complete and total control of your client."

11:30 The property isn't Lynette's anymore. It is owned by the trustee in the federal

11:37 bankruptcy court that she filed that somehow I'm being blamed for. Should be wearing my blame Jeremy shirt.

11:51 I don't recall ever ever telling anybody to go and file bankruptcy.

11:58 I do recall making fun of inadequate and yet huge-nosed lawyers.

# EXHIBIT 17 A,B,C – Property Inspection
# Proof Randall Mark Shochet is connected to William Gosney

## Party Name: William Gosney | Attorney: Randall Mark Shochet

| Case Number | Filed Date | Case Type | Status | Contested | Jury Trial |
|---|---|---|---|---|---|
| 382023CA000058CAAXXX (2023000058CAAXXX) | 03/08/2023 | Circuit Civil 3-C | CLOS | NO | YES |

| Filing Date | Description | Active | Contested | Judgment Date |
|---|---|---|---|---|
| 03/08/2023 | NEGLIG OTHER | NO | NO | - |

| Party Name | Party Type | Attorney | Bar ID |
|---|---|---|---|
| KREIDER, DAVID PHILIP | JUDGE | | |
| KREIDER, DAVID PHILIP | JUDGE AT DISPOSITION | | |
| GRIFFITH, PHILLIP Search This Party | DEFENDANT | KERKHOFF, JENNIFER L | 628085 |
| GRIFFITH, KIMBERLY Search This Party | DEFENDANT | GRIFFIS, STANLEY HOWARD | 118788 |
| GOSNEY, BRENDA Search This Party | PLAINTIFF | SHOCHET, RANDALL MARK | 959421 |
| GOSNEY, WILLIAM Search This Party | PLAINTIFF | SHOCHET, RANDALL MARK | 959421 |
| SHOCHET, RANDALL Search This Party | DEFENDANT | INKELES, DOREEN TURNER | 967475 |

+ Dockets

+ Judge Assignment History

– Court Events

| Event Date | Judge | Docket Type | Location | Prosecutor | Defendant Attorney |
|---|---|---|---|---|---|
| 10/10/2023 14:00 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |
| 10/10/2023 14:00 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |
| 10/10/2023 14:00 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | Inkeles, Doreen Turner |
| 10/10/2023 14:00 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | Shochet, Randall M |
| 10/10/2023 14:00 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | Shochet, Randall M |
| 12/18/2023 14:30 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |
| 12/18/2023 14:30 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |
| 12/18/2023 14:30 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | Inkeles, Doreen Turner |
| 12/18/2023 14:30 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | Shochet, Randall M |
| 12/18/2023 14:30 | DETHOMASIS, CRAIG C | MOTION HEARING | LEVY COUNTY COURT | | Shochet, Randall M |
| 04/16/2024 13:00 | DETHOMASIS, CRAIG C | EVIDENTIARY HEARING | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |
| 04/16/2024 13:00 | DETHOMASIS, CRAIG C | EVIDENTIARY HEARING | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |
| 04/16/2024 13:00 | DETHOMASIS, CRAIG C | EVIDENTIARY HEARING | LEVY COUNTY COURT | | Inkeles, Doreen Turner |
| 04/16/2024 13:00 | DETHOMASIS, CRAIG C | EVIDENTIARY HEARING | LEVY COUNTY COURT | | Shochet, Randall M |
| 04/16/2024 13:00 | DETHOMASIS, CRAIG C | EVIDENTIARY HEARING | LEVY COUNTY COURT | | Shochet, Randall M |
| 02/07/2025 10:15 | DETHOMASIS, CRAIG C | STATUS CONF HRG | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |
| 02/07/2025 10:15 | DETHOMASIS, CRAIG C | STATUS CONF HRG | LEVY COUNTY COURT | | GRIFFIS, STANLEY H III |

Filing # 246198031 E-Filed 04/17/2026 08:29:31 AM

EXH 17
ABC

IN THE CIRCUIT COURT OF THE 8th
JUDICIAL CIRCUIT IN AND FOR
LEVY CIRCUIT, FLORIDA

CASE NO. 2023-CA-0058

BRENDA GOSNEY and WILLIAM GOSNEY,
Plaintiffs,

vs.

PHILLIP GRIFFITH and KIMBERLY GRIFFITH,
Defendants.
_______________________________________/

PHILLIP GRIFFITH and KIMBERLY GRIFFITH,
Counter-Plaintiffs,

vs.

BRENDA GOSNEY and WILLIAM GOSNEY,
and RANDALL SHOCHET,
Counter-Defendants/Third-Pary Defendant.
_______________________________________/

## NOTICE OF SETTLEMENT

**PLEASE TAKE NOTICE** that the above-captioned matter has been settled in its entirety by Settlement Agreement executed by all parties on April 16, 2026. Notices of voluntary dismissal will be filed shortly.

Shochet Law Group
409 N. Main Street
Trenton, FL 32693
(352) 354-4518
By: */s/ Doreen Inkeles*
Doreen Inkeles, Esq.
FBN: 0967475
doreen@shochetlaw.com

UNOFFICIAL DOCUMENT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished to Stanley Griffis, Esq., stan@griffislawoffice.com and Jennifer



Electronically Filed Levy Case # 2023000058CAAXXX 04/17/2026 08:29:31 AM

Kerkhoff, Esq., jenkerkhoff@outlook.com this 17th day of April 2026.

BY: */s/Doreen Inkeles*
Doreen Inkeles, Esq.
FBN: 0967475

UNOFFICIAL DOCUMENT

BLAISE INGOGLIA
CHIEF FINANCIAL OFFICER
STATE OF FLORIDA

Licensee Search

Ex H
17

# Licensee Detail

**License #:** W094499

**Full Name:** GOSNEY, WILLIAM JOHN

**Business Address:** 240 MASTADON DR
INGLIS, FL 344499441

**Mailing Address:** 240 MASTADON DR
INGLIS, FL 344499441

**Email:** WGOSNEY@GMAIL.COM

**Phone:** (770) 833-8930

**County:** Levy

**NPN #:** 16379888

## Continuing Education Statistics

**CE Due Date:** 4/30/2028

**Continuing Education Status:** In Progress

**Number of Hours Required:** 20

**Number of Hours Completed:** 17

### Valid Licenses

| Type | Issue Date | Qualifying Appointment |
|---|---|---|
| ADJUSTER - ALL LINES (0620) | 9/18/2018 | YES |

### Active Appointments

**INDEPENDENT ADJUSTER - ALL LINES (0520)**

| Company Name | Issue Date | Exp Date |
|---|---|---|
| GRISTON CLAIM MANAGEMENT, INC. | 5/22/2026 | 4/30/2029 |

## Invalid Licenses

| Type | Issue Date | Status |
|---|---|---|
| NON-RES ADJUSTER - PROPERTY & CASUALTY (7544) | 4/30/2012 | INVALID |

## Inactive Appointments

### INDEPENDENT ADJUSTER - ALL LINES (0520)

| Company Name | Issue Date | Exp Date | Status Date |
|---|---|---|---|
| GOSNEY, WILLIAM JOHN | 9/19/2018 | 4/30/2025 | 1/12/20: |

### COMPANY ADJUSTER - ALL LINES (0620)

| Company Name | Issue Date | Exp Date | Sta Dat |
|---|---|---|---|
| CITIZENS PROPERTY INSURANCE CORPORATION | 1/8/2024 | 4/30/2026 | 4/1: |

### NON-RES INDEPENDENT ADJUSTER - PROPERTY & CASUALTY (7544)

| Company Name | Issue Date | Exp Date | Status Date |
|---|---|---|---|
| GOSNEY, WILLIAM JOHN | 5/9/2012 | 4/30/2019 | 9/18/201! |

Copyright © Florida Department of Financial Services 2026